UNITED STATES FIDELITY & GUARANTY CO., Appellee, v. IOWA TELEPHONE CO., Appellant, and CITY OF OTTUMWA, Appellee.

**BONDS: Construction—Ambiguous Connection of Unambiguous**
1 **Terms—Rejection of Terms.** Rule of construction: Not what the separate, definite parts of a contract mean when read as though standing alone, but what, in view of the ambiguous connections of the several parts, is the meaning of the entire instrument when read as a whole, and in the light of (a) the subject-matter of the contract, (b) the laws, if any, giving rise to the contract, (c) the situation, objects and purposes of the parties—in short, the entire connected history relating to and culminating in the contract. When the quest for the meaning is ended, it *may* be necessary, in order to apply the actual meaning, to wholly ignore some

terms of the contract—or at least to largely shave or restrict their ordinary meaning. So *held* where a surety bond, given to meet the requirements of an ordinance, apparently covered both the *construction* and future *maintenance* of a system of underground telephone conduits, but was held to cover *construction* only.

PRINCIPLE APPLIED:    Action by plaintiff, a surety company, against defendant, a telephone company, to recover eight years' premiums on a bond. · The history of the bond was: ·

First:    An ordinance, known as No. 633, provided that 'telephone wires should be placed underground; that, in the doing of said work, all excavations should be guarded and all pavement replaced; that the telephone company should pay to the city and to private persons all damages consequent on improper work, and should save the city harmless from all claims growing out of the *construction* and *maintenance* of such underground system.    The company, before entering upon the work, was required to present its plans, secure the approval thereof, and a permit, and give a bond *"conditioned that such company will restore, as provided by this ordinance, the streets, alleys and public places to be excavated under such permit, and pay all damages occasioned by the construction of such work."*

Second:    The council approved certain plans and ordered a permit to issue on the filing of a bond, *"conditioned as in said ordinance provided."*

Third:    The telephone company made written application to· plaintiff for the bond, stating that it was to be given as indemnity against damage that the telephone company *"may cause through the placing of an underground conduit system for their telephones."* A copy of the bond, in the identical form in which it was later issued, was attached to this application.    The telephone company agreed to pay $50 a year as premium, and to furnish the surety satisfactory proof *"at the termination of the case"* that .there was no further liability on said bond, and to at all times hold the surety harmless. ·

Fourth:    The bond was given.    It recited that it was given in pursuance of ordinance No. 633, and was entitled, ''Bond to comply with Ordinance No. 633.''    The conditions written into this bond were broader than the conditions exacted by the ordinance, being as follows:

''Now, if the said Iowa Telephone Company shall' and will in all respects comply strictly with the provisions of said Ordinance No. 633 in the laying of its wires, conduits, erection of its poles, and other appliances, and shall and will restore the streets and alleys of said city as required by said ordinance, as well as all other public places that may be excavated in the conduct of said

work, and shall pay all damages that the city may sustain by reason of any neglect *either in the construction of said improvements or in the maintenance thereof thereafter*, and shall in all other respects fully and completely comply with said ordinance, then this bond to be void, otherwise to be and remain in full force and effect.''

Fifth: The *construction* work was completed 15 months after the date of the bond. No claim was ever made that the *construction* work was not properly done or that the city or anyone had suffered damage thereby. The first year's premium was paid when the bond was given. The surety refused a tender of premium for an additional 3 months. The surety claimed that the bond stood as a guaranty not only of *construction* but of future *maintenance*.

*Held*, in the light of the entire foregoing history, the bond covered just what the ordinance demanded, no more and no less; in other words, that it guaranteed proper *construction* of the conduit system and payment of *damages consequent thereon*, and not *maintenance* after it was constructed.

**BONDS:** Construction—Bond in Excess of Statutory or Ordinance Requirement—Surplusage. Where an ordinance imposes a series of duties on one who is under the jurisdiction of the municipality, and specifies that, as to *some* of the duties, a bond shall be given for their faithful performance, it must be presumed, as to the duties concerning which no bond is required, that the city was content to rely on the personal responsibility of the one owing the duty, and therefore that that part of a bond in excess of the ordinance requirements is surplusage. .

PRINCIPLE APPLIED: See No. 1.

**BONDS:** Construction—Statutory Bonds—Inclusion of Non-Statutory Conditions—Common-Law Obligation. A bond containing the conditions prescribed by a statute or ordinance and intentionally given to comply therewith, is not converted into a common-law obligation by the addition of other conditions not required by the statute or ordinance.

PRINCIPLE APPLIED: See No. 1.

**BONDS:** Construction—Statutory Bonds—Inclusion of Non-Statutory Conditions—Effect. The validity or enforceable quality of a bond intentionally given in order to comply with a statute or ordinance does not extend beyond the conditions which the statute or ordinance prescribes.

PRINCIPLE APPLIED: See No. 1.

**ATTORNEY AND CLIENT:** Conduct of Attorney—Presentation of

Cause. It is worth while for attorneys to so present their causes that this may be said of them: "In leaving the case, we desire to express our obligation to counsel on both sides for the marked thoroughness with which the issues have been presented, and the perfect frankness and fairness with which each point has been argued", and it is worth while to here preserve it.

*Appeal from Wapello District Court.*—D. M. ANDERSON, Judge.

TUESDAY, MARCH 7, 1916.

ACTION at law to recover premiums alleged to be due the plaintiff as surety upon a certain bond given by the telephone company to the city of Ottumwa. There was a judgment for plaintiff, and the telephone company appeals. The material facts are stated in the opinion.—*Reversed and Remanded.*

*Parker, Parrish & Miller,* and *McNett & McNett,* for appellants.

*Tisdale & Heindel* and *M. C. Gilmore,* for appellees.

WEAVER, J.—The facts in this case are not in dispute. In the year 1903, the city of Ottumwa, by its mayor and council, adopted an ordinance designated in the record as Ordinance No. 633, regulating the use of its streets by telephone companies and requiring telephone wires to be laid underground. Among other things, it was therein provided that, before the laying of such wires should be begun, the company should make application to the council so to do, accompanied by plans and specifications of the proposed improvement, and that, upon approval of the application by the council, the city engineer should issue the necessary permit. It also provided as follows:

1. BONDS: construction: ambiguous connection of unambiguous terms: rejection of terms.

"Section V. In the location, construction or repair of any conduits, manhole, underground connection or distributing pole or excavation shall be necessarily made, placed or continued, and any excavation or obstruction made or placed

in any street, alley or public highway at any time or
for any purpose by any such person, firm or corporation,
shall be properly guarded, and any pavement, at any time or
for any purpose whatever taken up or displaced by any such
person, firm or corporation shall be properly and speedily
replaced and put in proper order by it under the supervision
of the city engineer; and the person, firm or corporation own-
ing or using the same shall pay all damages for injuries to
the person or property of any person, firm or corporation as
well as to the city of Ottumwa, resulting from, occasioned by,
or growing out of negligence or improper construction in the
laying, constructing or repairing of such conduits, manholes,
underground connections and distributing poles or the main-
tenance and use of same, and shall fully indemnify and save
harmless the city of Ottumwa from and against all claims,
actions or suits at law, or in equity of any kind or nature, for
damages to persons or property, resulting from, occasioned
by, or growing out of the construction, erection and mainte-
nance of such conduits, poles, underground connections, man-
holes and wires, or the negligence or omission of said com-
pany, its servants, agents, or employes, to properly guard any
excavation or obstruction at any time or for any purpose
whatsoever made, placed or caused in any street, alley or pub-
lic highway; or for the omission to properly and speedily re-
place and repave any opening or to keep such pavement in
proper repair so far as said repair may be made necessary
by the interference with said pavement caused by the location,
construction, use or repair of such conduits, poles, wires, un-
derground connections and manholes.  If any such person,
firm or corporation shall fail to repair any street, or alley
damaged by excavations made by it after five days' notice
so to do, made in writing to its local office in said city, then the
city shall make such repairs at the expense of such person,
firm or corporation and before commencing any work under
a permit issued by the city engineer under the provisions of
Section III hereof, such person, firm or corporation shall file

with the city council a bond in such sum, not exceeding five thousand dollars, as such city council may fix, with a surety company authorized to do business in the state of Iowa, as surety, or with not less than two personal sureties, to be approved by the city council, conditioned that such company will restore, as required by this ordinance, the streets, alleys, and public places to be excavated under such permit, and pay all damages occasioned by the construction of such work."

In May, 1904, the Iowa Telephone Company, owning a telephone system in the city, made written application for a permit under the terms of Ordinance No. 633, accompanied by the required plans and specifications. The application was approved in a resolution reading as follows:

## "Resolution.

"Be it Resolved by the city council of the city of Ottumwa, Iowa, that the map and specifications of the proposed underground conduit system to be constructed as a part of the general telephone system in Ottumwa, Iowa, of the Iowa Telephone Company in pursuance of Ordinance No. 633, be and the same is approved and said company authorized to proceed with said improvements as shown therein, and the city engineer is authorized and directed to issue the necessary permit therefor in compliance with said ordinance upon its executing to the city a bond in the sum of $5,000 conditioned as in said ordinance provided and upon the approval thereof by the mayor."

Thereupon, the telephone company, for the purpose of complying with the requirements of the city and to perfect its right to enter upon the work of laying the telephone wires as provided in the ordinance, made application to the United States Fidelity & Guaranty Company, plaintiff herein, to become surety upon its bond to the city, stating that the bond was to be given as indemnity against damage that the tele-

phone company "may cause through the placing of an underground conduit system for their telephones". Attached to the application was a copy of the proposed bond, identical in its language with the bond thereafter executed, upon which this action is based. The application also contained the following clause:

"And in consideration of The United States Fidelity and Guaranty Company consenting or agreeing to execute or guarantee the bond herein applied for, we do hereby covenant, promise and agree to pay the following premium or fees agreed upon, to wit, Fifty & No/100 Dollars per annum, and at the termination of the case to furnish said company with satisfactory and conclusive evidence that there is no further liability on said bond, and to indemnify, and keep indemnified, the said company from and against any loss, cost, charges, suits, damages, counsel fees and expenses of whatever kind or nature which said company shall or may for any cause at any time, sustain, or incur, or be put to, for, or by reason or in consequence of said company having entered into or executed said bond."

This application having been accepted by the plaintiff, the bond was executed and, upon presentation thereof to the city council, was duly approved. The bond is entitled, "Bond to comply with Ordinance No. 633," and is in the following words:

"KNOW ALL MEN BY THESE PRESENTS, that we, the Iowa Telephone Company as principal and the United States Fidelity & Guaranty Co., of Baltimore, Md., as surety, are held and firmly bound unto the city of Ottumwa, Iowa, in the penal sum of $5,000, well and truly to be paid at Ottumwa, Iowa, we bind ourselves, our heirs, executors, administrator and assigns by these presents.

"The conditions of this obligation is such, that whereas, the said Iowa Telephone Co. is about to place a part of its lines underground in the city of Ottumwa, Iowa, in pursuance of Ordinance No. 633 in relation thereto under the direction

of the city engineer and by permission of the city council which has fixed the bond required by said company under the provisions of said ordinance, at $5,000.

"Now, if the said Iowa Telephone Company shall and will in all respects comply strictly with the provisions of the said Ordinance No. 633 in the laying of its wires, conduits, erection of its poles, and other appliances, and shall and will restore the streets and alleys of said city as required by said ordinance, as well as all other public places that may be excavated in the conduct of said work and shall pay all damages that the city may sustain by reason of any neglect either in the construction of said improvements or in the maintenance thereof thereafter and shall in all other respects fully and completely comply with said ordinance, then this bond to be void, otherwise to be and remain in full force and effect."

The bond having been accepted, the telephone company entered upon the work of laying its wires under the streets, and completed the same on or about November 15, 1905, since which time it has continued to use and maintain said underground system of conduits and wires substantially as originally constructed.  About the time the work was begun, the company paid to the plaintiff the agreed premium of $50 on the bond for the period of one year, ending August 15, 1905, but has paid no further premium thereon since that date.  No claim has ever been made or is now made by the city that the work was not properly done or that the city has sustained any injury or damage by reason of any default on the part of the company in the performance of its duty in that respect or in the maintenance or repair of its said system in and under the city streets.

This action was begun by the surety company in 1907 to recover from the telephone company the unpaid premiums alleged to have accrued upon the bond, and from time to time since that date it has filed supplemental petitions, increasing its demand to cover other yearly premiums alleged to have become due pending the very leisurely progress of

this litigation. The petition, as amended, states an ordinary cause of action at law for the recovery of unpaid premiums on the bond, together with a brief history of the facts in connection with its execution. In July, 1914, only seven years after the filing of the petition, the defendant answered, admitting the giving of the bond and that plaintiff is entitled to recover the premium earned thereon from August 15, 1905, the expiration of the first year, to November 15, 1905, the date of the completion of the work, but denying that it is in any other manner or amount indebted to the plaintiff. The theory of the defense as pleaded is that the bond was given and intended by all parties thereto to comply with the ordinance provision providing therefor, and upon no other or additional condition; that such conditions were, in fact, fully performed, and the work completed upon the date last above named, at which time, the bond having fully served its purpose, ceased to have legal force or effect. It is further averred that said work was done and completed without any damage or injury to the city or the public in the work of construction or by reason of any neglect with reference thereto, and neither the city nor any other person entitled to rely upon said bond has, since the completion of the work, asserted or now asserts any claim against the defendant, nor had plaintiff since that date been in any manner liable or exposed to damage or loss in any form because of such obligation.

The action was brought against the telephone company alone. That company, in addition to its answer above mentioned, filed a cross-petition, impleading the city as a party, alleging that the obligation of the bond had been fully performed, and asking judgment for its cancellation and surrender.

Upon the record so made, the trial court held with the plaintiff that the obligation of the bond was not limited to the construction of the underground wire system and payment of damages occasioned thereby, but was of a continuing character. The cross-petition was therefore dismissed, and judg-

ment rendered for the plaintiff against defendant for the unpaid yearly premiums for the period from August, 1905, to the date of trial, and that the bond be continued in full force and effect.  The telephone company appeals.

The foregoing statement is perhaps more extended than is strictly necessary, but, in view of the somewhat peculiar nature of the question presented for our consideration, we have desired to omit nothing which, upon any theory of the case, counsel on either side may think has material bearing on the controversy.

The one question thus presented is whether the obligation of the bond is limited to the period covered by the work of construction, or continues after such work has been performed in a satisfactory manner and covers the proper maintenance of the completed system indefinitely in the future. The plaintiff holds to the latter theory, while defendant argues for the former.

Were the matter to be decided solely upon the literal reading of the bond, without any reference to the circumstances calling it into existence, the position taken by the plaintiff would probably have to be sustained; for, among the conditions as written, we find it provided that the defendant shall pay all damages which the city may sustain by reason of any neglect in the construction of the proposed improvements, "or in the maintenance thereof thereafter".  The real inquiry to which we must address ourselves is, therefore, the proper construction of the bond, with particular reference to the nature and extent of the obligation assumed by the surety.  This is not to be determined by reference solely to the single sentence or clause where alone are found any words capable of being construed to import a continuing obligation. It is a well-settled rule of construction that the legal force and effect of a contract or bond are to be ascertained by taking into consideration the entire instrument in all its parts. It is true that, if such instrument is complete in itself and its meaning is not obscured by any ambiguity in its terms

and none arises in giving it practical application, then it is not open to construction, and must be given effect according to the plain and well-established meaning of the language employed therein; but such perfection of form is the exception rather than the rule. The one purpose of all construction and interpretation is to ascertain the intent actuating the parties to the agreement, if that end can be accomplished consistently with the rules of evidence. It may often appear (and does quite readily appear in the instant case) that to ascertain the real scope and effect of the bond necessitates reference to the facts and circumstances of the entire transaction of which it was a part. As said by this court in *Jacobs v. Jacobs,* 42 Iowa 605:

"The whole contract must be considered in determining the meaning of any of its parts. The first point is to ascertain what the parties meant, and then to put such construction upon their contract as will bring it as near to their actual meaning as the words they saw fit to employ, when properly construed, and the rules of law will permit. In arriving at this meaning, the subject-matter of the contract, the situation of the parties and of the property, and the purpose of the parties in making the contract must be considered."

In *Corbett v. Berryhill,* 29 Iowa 157, it is said:

"The intention of the parties may be ascertained by evidence of extrinsic circumstances which surround the transaction, the court thereby placing itself in the situation of the contracting parties whose language it is called upon to construe. The circumstances and situation of the parties thus become a medium through which their intentions may be discovered. . . . The objects which the parties had in view in inducing the contract are also to be considered in its construction. . . . As the actions of men are usually the index of their intentions, it is obvious that their acts may be proved, in connection with their contracts, in order to arrive at their true intention in regard to the obligations they assume and accept from others."

An early and leading case upon this rule of construction is *Field v. Schricher,* 14 Iowa 119, where this court held that a bond on appeal, conditioned upon terms importing an absolute undertaking of the surety to pay the judgment rendered below, was construed to have only the force and effect of a statutory appeal bond, obligating the surety to pay the judgment only in case of an affirmance. Indeed, the rule has the general approval of all the courts of this country, though it may be that in some jurisdictions it has been applied with more freedom than in others. The consensus of judicial opinion thereon is well represented by Sanborn, J., in *Kauffman v. Raeder,* 47 C. C. A. 278, where, in reference to the construction of a written contract, he says:

"It will be conducive to brevity and perspicuity to obtain a clear idea of the relations of the parties to the agreement to be considered, their respective covenants therein, and the moving considerations which induced them to make their stipulations, before entering upon the discussion of this issue. This conception must be secured by the light of the fundamental rule that the situation of the parties when the contract was made, its subject-matter, and the purpose of its execution are material to determine the intention of the parties and the meaning of the terms they used, and that when these are ascertained they must prevail over the dry words of the stipulations."

For the proper application of the rule of these authorities, it is well to briefly recall the situation and relation of the parties at the time this bond was given. The city had, by Ordinance No. 633, required telephone wires to be laid underground. The appellant telephone company, in obedience thereto, prepared to enter upon the prescribed improvement; but, before securing formal permit to enter upon the streets for that purpose, the ordinance provided that a bond conditioned upon certain prescribed terms should be given and approved by the city. To meet this requirement, the telephone company made written application to the plaintiff

surety company to become surety upon such bond, and thereupon the application was accepted, the bond in suit was executed and approved as a sufficient compliance with the ordinance, and the work of improvement was then begun and carried to completion.

Having thus ascertained the situation of the parties and their relation to each other, let us proceed to apply the next test which the authorities all recognize, and that is "the purpose of the parties in making the contract". Looking at the situation as it here appears without dispute, there is no room for doubt that the purpose in making and giving the bond to the city was to meet the requirement for security for the restoration of the city streets, alleys and public places, and payment of damages caused by the work of construction. Can it be reasonably believed that defendant understood that it was giving a bond far in excess of what the ordinance required at its hands? Can it be believed that the surety company understood that it was binding itself to secure the city against other and greater hazards than those mentioned in the ordinance, or that the city intended to ask or receive more than was provided for in the ordinance? We think it may be accepted as a matter of common knowledge and observation that neither men nor corporations are likely to voluntarily thus add to the burdens of their contracts without obtaining, or at least having in view, some corresponding or compensatory advantage to themselves. But we are not without evidence strongly supporting the inference or presumption to which we have adverted. For example, the application upon which the plaintiff signed the bond states the purpose of the bond to be "to indemnify the city against any damages that said telephone company may create through the placing of an underground conduit system for their telephones". The bond itself was entitled or captioned, "Bond to comply with Ordinance No. 633". And again, in the body of the bond, it is recited that the work is to be done "in pursuance of Ordinance No. 633", and that such bond has been fixed by the council

as required by "the provisions of said ordinance". Still, again, if we turn to the resolution passed by the city council prescribing the bond which it required of the defendant, it is recited that the work is to be done as provided by Ordinance No. 633, and that the bond which the defendant was required to give should be "conditioned as in said ordinance provided". All these matters—the city ordinance, the application of the telephone company for permit to proceed thereunder, the resolution approving the application and fixing the bond, the application for the bond and the bond itself—are all parts of one connected transaction, all of which must be considered if we are to arrive at the intention of the parties. Indeed, the bond by its express terms refers to the ordinance and to the permit granted by the council, and these must be read into the contract as a part of its provisions. At every step of the proceedings and nearly every mention of the bond, it is declared to be the bond required by the ordinance. The final act of the council fixing the penalty of the bond which must be given before permit will issue orders in so many words that it shall be "conditioned as in said ordinance provided"; and later, the bond in suit was accepted and approved as a compliance with that order.

Right in this connection, and at the risk of repetition, let us once more call attention to what the ordinance did prescribe as to the conditions of the bond. It is found in the latter part of Section No. 5, hereinbefore quoted in full, and provides that the bond to be given shall be "conditioned that such company will restore, as provided by this ordinance, the streets, alleys and public places to be excavated under such permit and pay all damages occasioned by the construction of such work". This, nothing more and nothing less, is required. It at once defines and limits the authority of the city council to exact any bond as a condition upon which it will permit the defendant to do the work which the city orders done. If, without repealing or amending the ordinance, the council had demanded and received a bond materially increasing the

obligations prescribed by the ordinance, it would doubtless be held void or voidable to the extent of such unauthorized demand, as will be seen by the authorities to which we will later call attention. But no such demand was made. What the council did demand, as shown by its resolution, was a bond "conditioned as provided by such ordinance". It appears, however, that, in drawing the bond, it was conditioned not only as prescribed by the ordinance, but inserted therein was an additional clause, which, standing alone, does not express a complete idea, but, read in connection with its immediate context, enlarges its effect much beyond the ordinance requirement. To give it literal effect would be so contrary to the general intent and purpose of the parties, as shown beyond reasonable doubt by an examination of the entire record, that we must decline so to do.

Strictly speaking, while a word or clause, the ordinary meaning of which is not at all doubtful or obscure, is not the subject of construction, yet it not infrequently happens that when such word or clause is incorporated into a written contract, it becomes obscure or uncertain, because of the connection in which it is found, or because its literal sense is out of harmony with the clearly manifest general intent and purpose of the contract. In such case, construction *is* proper; and if the general intent and purpose of the contract considered as a whole is fairly ascertainable, it will be given effect, even though it involves the necessity of giving such word or clause a modified meaning, or holding it so repugnant to the intent of the parties that it may be ignored altogether. It cannot be presumed that the parties intended to make a contract one part of which should be repugnant to another. Indeed, the presumption is to the contrary; and if, upon considering all parts of the writing in the light of all the circumstances attending the transaction, one of the inconsistent provisions better expresses the apparent intent than the other, it should prevail. *Knower v. Emerson*, 9 Pick. (Mass.) 422; *Straus v. Wanamaker*, 175 Pa. 213; *Hibbard v. McKindley*, 28 Ill. 240;

*Dowiat v. People,* 193 Ill. 264, 267; *Cochran v. County of Ver-milion,* 113 Ill. App. 140; *City of Garden City v. Heller,* 61 Kas. 767; *Walker v. Douglas,* 70 Ill. 445. In the construction of a contract, particular words should give way to the evident intent appearing from a view of the entire agreement. *Field v. Schricher,* 14 Iowa 119; *Donahoe v. Kettell,* 1 Cliff. 135; *Smith v. Davenport,* 34 Me. 520; *Davis v. Hendrix,* 59 Mo. App. 444; *Chase v. Bradley,* 26 Me. 531; 2 Page on Contracts, Sec. 1113. And while due consideration is to be given each and every part of the writing, the ultimate problem in the construction of every contract is not what the separate parts mean, but what is the meaning of the entire instrument, when read as a whole. 2 Page on Contracts, Sec. 1112. And the fact that a particular clause relied upon by one of the parties is in itself clear and unambiguous does not exempt it from construction as a part of the entire contract. This subject is very lucidly discussed in *O'Brien v. Miller,* 168 U. S. 287, 297. Referring to a particular clause of the bond there in suit, which one of the parties insisted was clear and unambiguous and therefore not subject to construction, the court says that the words considered by themselves alone are not ambiguous:

"But the question presented involves not the interpretation of this language apart from the whole agreement, but is, on the contrary, the ascertainment of the meaning of the entire contract. The fallacy which underlies the assumption as to want of all ambiguity in the bond arises, therefore, from presupposing that, in order to establish want of ambiguity in a contract, a few words can be segregated from the entire context, and, that because the words thus set apart are not intrinsically ambiguous, there is no room for construing the contract itself. In other words, the confusion in thought consists in failing to distinguish between the contract as a whole and some of the words found therein."

Speaking along the same line, the New Jersey court has said:

"But the adverse argument is that the agreement of the parties is to be ascertained from the plain language used by them, and such agreement is to be enforced, no matter what the intention may have been. This is the general rule, beyond a doubt, but such required literalism is not to be pushed to the preposterous length of requiring that by its operation the general intention of the parties, as evidenced by their contract itself, shall be frustrated or perverted, either in whole or in part. The terms employed are servants and not masters of a perspicuous intent; they are to be interpreted so as to subserve and not to subvert such intent." *Chism v. Schipper*, 51 N. J. L. 1.

The case of *First Nat. Bank v. Gerke*, 68 Md. 449, is quite in point with the one at bar. There, one Lisle was employed as assistant bookkeeper in the bank, and was required to give a bond for the faithful performance of his duty. A bond upon which Gerke became surety was given and accepted. It was conditioned to secure the faithfulness of Lisle "for and during the time he shall continue in the employment of the said First National Bank of Baltimore". It will be noted that the literal effect of this condition was to bind the surety so long as his principal remained in the employment of the bank. Lisle remained with the bank several years, during which time he was promoted to the position of discount clerk and therein defaulted. Being sued upon the bond, the surety insisted that the obligation was intended to stand as security only so long as Lisle remained in the position to which he was first appointed, and that the obligation did not extend to defaults made after he was promoted to another position. As in this case, the plaintiff pointed to the express language of the bond and insisted upon its right to recover accordingly, but the court sustained the defense. In affirming that judgment upon appeal the court says:

"And it is a principle of universal application that, in order to arrive at the intention of the parties, the contract itself must be read in the light of the circumstances under

which it was entered into. General or indefinite terms employed in the contract may be thus explained or restricted in their meaning and application; and the contract must be so construed as to give it such effect, and none other, as the parties intended at the time it was made."

See also *Cooke v. Graham,* 3 Cranch. 229. Having found, therefore, as already said, that the intention and purpose of the bond were simply to comply with the terms of the ordinance and to create an obligation dependent upon the conditions therein prescribed, and nothing more, the court is in duty bound to construe it accordingly.

We do not overlook the fact, which is emphasized in argument by the appellee, that the ordinance does charge appellant with the duty not alone of the proper construction

2. Bonds: construction: bond in excess of statutory or ordinance requirement: surplusage.

of its underground system, but with the future maintenance and repair as well, and the point made is that the bond should be treated as securing the performance of all these duties in their entirety. But we think that the contention is without real merit. Until the passage of Ordinance No. 633, the city was under no obligation to exact the giving of *any* bond.

In exercising its legislative discretion to demand security, it could, we may concede, have required the conditions of the obligation to be as broad and comprehensive as the duties which the telephone company was required to perform, or it could require security only as to those duties the neglect of which the council believed created greatest hazard of damage to the public. When, therefore, after enumerating the list of requirements laid upon the telephone company, the ordinance proceeds to say that a bond shall be given to secure the faithful performance of certain items thereof only, it must be assumed that no more was intended than was therein expressed, and that, as to those duties concerning which no bond was exacted, the city was satisfied to rely upon the direct liability of the company.

Finally, it is argued that, conceding the conditions of the bond as written to be in excess of the requirements of the ordinance, it may still be enforced as a common-law obligation.

3. BONDS: construction: statutory bonds: inclusion of non-statutory conditions: common-law obligation.

In support of this proposition, counsel submit many precedents. That this and other courts have held in proper cases that where, for any reason, a bond given in professed or attempted compliance with a statute is so defective as to be unenforceable as a statutory obligation, it may still be enforced as a common-law undertaking, may be freely admitted. The Iowa cases cited are *Sheppard & Morgan v. Collins,* 12 Iowa 573; *Baker v. Bryan,* 64 Iowa 565; *Painter v. Gibson,* 88 Iowa 123; *Garretson v. Reeder,* 23 Iowa 24. Three of these cases from this court were suits upon delivery bonds, in all of which the parties signing the bonds had secured the delivery of attached property into their hands, and it was held that even though the statutes made no provision for such a bond, or the bond did not conform substantially to the statute, yet, if the obligors saw fit to offer their personal obligation in place of the attached property and it was accepted, the bond could be enforced—a conclusion which is not open to question. In the fourth case, *Baker v. Bryan,* the statute authorized the school district to exact a bond from a contractor to whom the building of a schoolhouse had been awarded, but *it did not prescribe the conditions* of such bond; and it was held that a provision therein requiring the contractor to pay all claims for materials and labor in the construction of the building (in which respect the obligation of the bond followed the obligation of the contract) was valid and enforceable. It will be readily seen that none of the precedents are in point with the question which confronts us here. In no case cited to us and in none falling under our observation, where a statute provides for the giving of a bond and prescribes its conditions, and the bond in the decided case contains all the statutory conditions, has it been held that the

inclusion in such bond of other or non-statutory conditions has the effect to convert it into a common-law obligation. Indeed, the entire trend of the cases is to the contrary. In the first place, where the bond is given as a statutory obligation, the court will construe it, so far as it properly may, to sustain the statutory purpose; and even though it be informal or contain terms which, considered alone, might indicate an absolute, rather than a contingent, liability, yet, if it be clear that the intention was to comply with the statute, it will be so treated and enforced. This was the distinct holding in *Field v. Schricher, supra.* It is indeed thoroughly well settled that in such, if the added or non-statutory conditions are separable from those required by the statute, they will be treated as surplusage and of no effect. 5 Cyc. 750, notes 26, 27, 28; 4 R. C. L., pp. 53, 54, Secs. 13 and 14; *Walker v. Chapman,* 22 Ala. 116, 124; 4 Meyer's Federal Decisions, Sec. 234; *Yost v. Ramey,* 103 Va. 117; *State v. Findley,* 10 Ohio 51; *Woods v. State,* 10 Mo. 698; *Vroom v. Executors of Smith,* 14 N. J. L. 479; *United States v. Hodson,* 10 Wall. 395; *United States v. Mora,* 97 U. S. 422; *Pratt v. Wright,* 13 Gratt. (Va.) 175; *Gibson v. Beckham,* 16 Gratt. (Va.) 321; *Hutchinson v. Fulghum,* 4 Heisk. (Tenn.) 550; *State v. McGuire,* 46 W. Va. 328. To quote the language of this court in the *Field* case:

"When, from the language used, a legitimate statutory object and purpose can be seen to have been intended, it will not be presumed that the parties voluntarily made a bond good only at common law."

And it would be an anomalous holding to say that a bond may be enforced as a statutory obligation and also as an obligation at common law. In Tennessee, where the statutory condition of an appeal bond was for the payment of costs only, or for costs and damages, and a bond was given to perform the judgment, it was held that the condition would be cut down to that prescribed by the statute. See *Hutchinson* case, *supra.* In the *Woods* case, the court says:

"The stipulations in the bond not required by the stat-

ute may be rejected as surplusage, and the bond still be regarded as a statutory bond, and sued upon as such.''

Summing up the authorities, it is said in 4 R. C. L. 54:

''The prevailing doctrine is that where the conditions of a statutory bond are separable and part are authorized by the statute and part not authorized or even prohibited, and the statute does not   .   .   .   declare it void as a whole, the conditions not authorized or prohibited may be rejected as surplusage and the residue sustained as a good statutory bond *pro tanto*.''

But in our judgment, the question whether a bond found insufficient as a statutory bond may still be given effect as a common-law obligation never arises until the court has first found that the proved facts and circumstances are insufficient to sustain a finding that a statutory bond was intended by the parties thereto. Upon this preliminary question, we have been compelled to find against the plaintiff, and hold that the intent to conform the bond to the ordinance requiring it has been well proved.

Upon the final proposition, having found that the bond was intended as a statutory or ordinance obligation, we hold that its validity or enforceable quality does not extend beyond the conditions which the ordinance prescribed. It follows of necessity that liability upon the bond did not survive the completion of the work of construction of the underground system of wires, the restoration of the streets, alleys and public places excavated for that purpose, and the payment of damages occasioned by such work, and that the liability of plaintiff as surety upon the bond must be considered as having ceased with the completion of the improvement. It is admitted that the work was completed November 15, 1905, and that the premium on the bond was paid only to August 15, 1905. A tender of the premium for this period of three months is pleaded in the answer. So far as we have noticed, the record before us

4. BONDS: construction: statutory bonds: inclusion of nonstatutory conditions: effect.

discloses no  evidence or agreement concerning such alleged tender; and as the proper taxation of costs will turn to some extent upon the question whether tender was made, and, if made, whether it has been kept good, the matter of such taxation will be remanded for disposition by the trial court.

As, in our judgment, the first point on which we have dwelt in this opinion is determinative of the appeal, we have not gone into any review of other authorities cited by the appellee, none of which seems to us at all inconsistent with our conclusion.  It follows from what we have said that the judgment appealed from must be reversed and the cause remanded to the trial court, with direction to enter a judgment reducing the amount of plaintiff's recovery to the amount of premium earned upon the bond from August 15, 1905, to November 15, 1905, with interest thereon from the latter date to the date of the tender of payment, if such tender be shown; or, in case no tender is shown, interest will be computed to the date when judgment is finally entered.  Costs accrued up to date of tender will be taxed to defendant; or, if no tender be shown, all costs will be so taxed except costs of the appeal, which, in any event, will be taxed to the plaintiff.  The judgment dismissing the defendant's cross-petition is also reversed, and judgment will be entered cancelling the bond.

In leaving the case, we desire to express our obligation to. counsel on both sides for the marked thoroughness with which the issues have been presented, and the perfect frankness and fairness with which each point has been argued.—*Reversed* and *Remanded*.

5. ATTORNEY AND CLIENT: conduct of attorney: presentation of cause.

EVANS, C. J., DEEMER and PRESTON, JJ., concur.