JOHN C. ZAPF, Appellant, v. PERRY J. RIDENOUR et al., Appellees.

**BONDS:** Statutory Bonds—Surplusage. Principle reaffirmed that the
1 provisions of a statutory bond which are beyond the call of the
   statute are surplusage.

**BONDS:** Statutory Bonds—"Blue Sky Act." The original "Blue Sky
2 Act" (Ch. 13-B, Tit. IX, Code Suppl. Supp., 1915), in requiring a

broker's bond to be conditioned for a "strict compliance with this act," required a bond which would indemnify parties who were damaged by reason of the fraudulent representations of the broker in the sale of securities.

STATUTES:   Construction—Blue Sky Act—"Foreign Government."
3   The provisions of the "Blue Sky Act" (Sec. 8526, Code of 1924) to the effect that it does not apply to the securities of a "foreign government," refer to a foreign government such as is commonly and generally known and recognized as a *national* government, and not to the *separate governmental subdivisions* of a foreign national government.

STATUTES:   Blue Sky Act—"Broker" Defined.   A "broker" for the
4   sale of securities under the so-called Blue Sky Act is none the less a broker because of the fact that the vendee of securities first consults the broker with reference to the purchase, instead of the broker's first consulting the vendee.

*Appeal from Polk District Court.*—JOSEPH E. MEYER, Judge.

NOVEMBER 11, 1924.

SUIT on broker's bond, given to the state under the provisions of the statute. The trial court directed a verdict in behalf of the defendant, and the plaintiff appeals.—*Reversed.*

*Stipp, Perry, Bannister & Starzinger,* for appellant.

*E. D. Samson* and *Don Evans,* for appellee.

FAVILLE, J.—Chapter 13-B, Title IX, Supplemental Supplement to the Code, 1915, contains what is commonly known as the "Blue Sky Act." This statute has since been amended, and is now a part of Chapter 393, Code of 1924.

1. BONDS: statu-
tory bonds:          The statute requires that, before a stockbroker
surplusage.          may engage in business as such, in this state, he must secure from the secretary of state a permit. The original act under which this suit arose provided as follows:

"Before being granted such permit by the secretary of state the stockbroker or dealer shall give a bond in the penal sum of five thousand dollars to the state of Iowa, conditioned

upon a strict compliance with this act which bond shall be approved by the executive council and filed with the secretary of state.'' Section 1920-u16, Supplemental Supplement, 1915.

Section 1920-u21 of said original act is as follows:

''Any person, firm, association, company or corporation, or any agent or representative thereof, whether subject to the provisions of this act or otherwise, that sells, offers for sale or negotiates for the sale of any stocks, bonds, or other securities within this state, and knowingly makes any false representations or statement as to the nature, character or value of such security, or the amount of the earning power of such security whether in the nature of interest, dividends or otherwise, or knowingly makes any false or fraudulent representation concerning the financial condition, the assets or the property of the company, firm or corporation issuing said security, or knowingly makes any other false or fraudulent representation to any person for the purpose of inducing said person to purchase said security, or conceals any material fact in the advertisement or prospectus of such security for the purpose of misleading or defrauding the purchaser, shall be guilty of a misdemeanor and upon conviction be punished by a fine of not more than two thousand dollars or by imprisonment of not to exceed six months in the county jail, or by both such fine and imprisonment.''

In pursuance of the terms of said act, appellee Ridenour was granted a permit to operate as a stockbroker in this state, and he executed and delivered to the secretary of state a bond which was duly approved by the executive council, the conditions of which were as follows:

''Now, therefore, if the said Perry J. Ridenour shall as such broker comply strictly with such provisions of said Chap. 13-B, Title IX, Supplemental Supplement to the Code, 1915, of the state of Iowa, and shall pay any and all fines assessed against them for the wrongful sale of stocks, bonds or other securities, and shall pay any and all damages sustained by any person or corporation growing out of any transaction appertaining to the business of brokers or dealers in securities as defined in such state, then this obligation to be void, otherwise to be and remain in full force and effect in law.''

The said bond was signed by appellee the American Surety Company of New York, as surety.

In March, 1920, appellant entered into negotiations with Ridenour for the purpose of having the said Ridenour purchase for appellant a 100,000 mark bond of the state of Hamburg, Germany, and paid Ridenour the sum of $2,500 therefor. It was agreed that the bond should be delivered within six weeks from the date of said order. A so-called "interim certificate" was sent appellant by Ridenour. No bond was ever delivered, and thereafter Ridenour absconded. This action is brought to recover the said sum of $2,500 on the bond so given by appellees and filed with the secretary of state.

I. The first question for our consideration is whether or not the terms and conditions of the bond are broader than the requirements of the statute at the time the bond was given.

The bond is a statutory bond. By its terms and provisions it is broad enough to entitle appellant to recover the damages sought. It is contended, however, that the bond is broader and more comprehensive than is required by the statute.

We are committed to the doctrine that, where a strictly statutory bond is given, there can be no liability on such bond beyond the terms and provisions of the statute, even though the bond may have incorporated therein terms and provisions in excess of and in addition to the legislative requirements. See *United States Fid. & Guar. Co. v. Iowa Tel. Co.*, 174 Iowa 476; *Schisel v. Marvill*, 198 Iowa 725; *Nebraska Culvert & Mfg. Co. v. Freeman*, 197 Iowa 720.

2. BONDS: statutory bonds: "Blue Sky Act."

It is the contention of appellee surety company that, under the provisions of the statute as they formerly existed, the bond was only required to be conditioned for the benefit of the state for such an amount as might be due the state from the broker in the way of filing fees, fines, etc.; and that, under the original statute, there was no requirement that the bond should be for the benefit of any individual who might suffer injury by reason of false representations on the part of the broker.

Under the rule announced in the authorities above cited, if the terms and provisions of the bond are in excess of the re-

quirements of the statute, it being a statutory bond, there could be no liability on the bond as to such extra provisions. In other words, a statutory bond cannot be broadened by its terms to include matters not provided for in the statute, and liability be predicated thereon as a statutory bond.

It must be conceded that the bond in suit, by its terms, is sufficiently broad to permit recovery by appellant for damages he suffered by reason of the fraudulent acts of the broker; so that the sole question at this point is whether or not the statute, by its terms, as it was originally, provided for a bond that is broad enough to permit recovery in behalf of an injured individual who has been defrauded by the act of the broker furnishing the bond.

The original statute required that a bond should be given, "conditioned upon a strict compliance with this act." Now, what does a strict compliance with the act require? It requires that a stockbroker granted a permit in this state shall not do the things which the statute prohibits. Under the act, a permit is granted to engage in a certain line of business, to wit: that of a stockbroker or dealer. Section 1920-u21, while penal in its character, clearly defines the duties of a stockbroker. It is rather negative than affirmative in its recitals, and provides for punishment of any broker subject to the provisions of the act, who sells, offers for sale, or negotiates for the sale of any stock, bonds, or other securities, and knowingly makes any false representations or statement as to the nature, character, or value of such securities, or the amount of the earning power of such securities, whether in the nature of interest, dividends, or otherwise, or knowingly makes any false or fraudulent representations concerning other matters specified in the statute, or conceals any material facts in the advertisement or prospectus of such security for the purpose of misleading or defrauding the purchaser, or who knowingly violates any provision of the chapter, with intent to defraud.

The clear purport and intent of the statute, and in fact its express terms, are to prohibit the doing of certain things by the stockbroker, in the way of making representations, and so on. The bond is conditioned upon a strict compliance with this act.

In other words, the statute requires that a bond shall be conditioned in accordance with the provisions of the act: that is to say, it shall be conditioned that the broker granted the permit to operate in this state will not do the prohibited things.

We are constrained to hold that the terms of the statute, when read in their entirety, are sufficiently broad to make the condition of the bond in question conformable to and consonant with the terms and provisions of the statute. In other words, our holding is that the bond was a statutory bond, and that the terms and provisions of the statute required the giving of a bond conditioned substantially as was the bond in suit. Such was our holding in *Wagner v. Kelso*, 195 Iowa 959, where a suit was brought by a private party upon a bond identical in terms with the bond sued upon in this action. In said action we said:

"By the terms of the bond, the surety undertakes not only that the brokers will 'strictly comply' with the statute, but will 'pay any and all damages sustained appertaining to the business of brokers, as defined in such statute.' It is to be remembered that this bond is required and given to secure the purchaser of stock against loss or damage by the default or wrong of the broker making the sale. In the language of the instrument itself, the surety undertakes that the broker will pay or make good to the purchaser all damages he may suffer, 'growing out of any transaction appertaining to the broker's business.'"

We are disposed to adhere to the pronouncement therein made, and to hold that the bond in question is a statutory bond, and that, by the terms and conditions of the statute, when read in its entirety, the bond did no more than to conform to the terms and provisions of the statute. It therefore was a bond that inured to the benefit of appellant or any other person who suffered damages by reason of the violation of the statute on the part of the broker. The trial court erred in directing a verdict for the defendant on the ground that the provisions of the bond permitting recovery on the part of appellant were extra-statutory.

II. Section 1920-u1, Supplemental Supplement to the Code, 1915, provides that there shall be certain exceptions from the operation of this act, and that it shall not apply to "securi-

3. STATUTES: construction: Blue Sky Act: "foreign government." ties of this state, or of the United States, or of any state or territory thereof, or of any foreign government, or of any district, county, township, city, town or other public taxing subdivision of any state or territory of the United States, including all drainage, county, school or other municipal bonds of this state."

The bond which it is alleged appéllant purchased from the broker is described as a 100,000 mark bond of the state of Hamburg. The question at this point is whether or not the state of Hamburg is a "foreign government," within the meaning of the above statute, so that the provisions of the act do not apply. Appellee contends that the "state of Hamburg" is a "foreign government," within the meaning of the statute, and therefore comes within the exception therein provided.

The transaction in question took place in March, 1920. It appears from the record that the free state of Hamburg was incorporated into the German empire by the German constitution of 1871. This constitution lists the states that formed a part of the German Empire as follows:

"The territory of the confederation shall consist of the states of Prussia (with Lauenburg), Bavaria, Saxony, Wurtemburg, Baden, Hesse, Mecklenburg-Schwerin, Saxe-Weimer, Mecklenburg-Strelitz, Oldenburg, Brunswick, Saxe-Meiningen, Saxe-Altenburg, Saxe-Coburg-Gotha, Anhalt, Schwarzburg-Rudolstadt, Schwarzburg-Sondercausen, Waldeck, Reuss (elder branch), Reuss (younger branch), Schaumburg-Lippe, Lippe, Lubeck, Bremen, and Hamburg."

Said constitution also provides that:

"Within this territory the empire shall exercise the right of legislation according to the provisions of this constitution; and the laws of the empire shall take precedence of those of each individual state. The laws of the empire shall be rendered binding by imperial proclamation, such proclamation to be published in a journal devoted to the publication of the laws of the empire (Reichsgesetzblatt—Imperial Gazette). If no other period shall be designated in the published law for it to take effect, it shall take effect on the fourteenth day after its publication in the Imperial Gazette at Berlin."

The constitution of the German commonwealth, adopted after the World War (1919), provides as follows:

"The territory of the commonwealth consists of the territories of the German states.  Other territories may be incorporated into the commonwealth by national law, if their inhabitants, exercising the right of self-determination, so desire."

And it also provides:

"The commonwealth has exclusive jurisdiction over:

"1.   Foreign relations;

"2.   Colonial affairs;

"3.   Citizenship, freedom of travel and residence, immigration and emigration, and extradition;

"4.   Organization for national defense;

"5.   Coinage;

"6.   Customs, including the consolidation of customs and trade districts and the free interchange of goods;

"7.   Posts and telegraphs, including telephones."

There is some analogy between the several "states" composing the German commonwealth and the states of the American union.  Suppose, for example, that Great Britain had a statute similar to the one in controversy and referring therein to a foreign government, would it be held that the state of Iowa, with all of its sovereign power to issue bonds, was a "foreign government" in its relation to Great Britain?  In the instant case, can it be said that the state of Hamburg, one of the states composing the German commonwealth, is a "foreign government" in its relation to the United States or to the state of Iowa?  In *King v. Parks*, 19 Johnson (N. Y.) 375, it is said:

"A foreign kingdom is defined 'as one under the dominion of a foreign prince, so that Ireland or any other place subject to the crown of England, cannot be called foreign, though, to some purposes, they are distinct from the realm of England.' The several states of the Union are, as to their local governments and municipal regulations, distinct from each other; but, as regards their national concerns and exterior relations, they compose but one government."

Webster's International Dictionary defines the word "government" as "body politic—a state."  The statute in question

must be construed somewhat in view of the purpose to be effectuated, and in connection with the context. We think it is apparent therefrom that the words "foreign government," as used in the exception to the statute, referred to a foreign government such as is commonly and generally known and recognized as a national government. When so regarded, the state of Hamburg cannot be considered as a foreign government, within the meaning of this statute.

III. Another ground of the motion for a directed verdict was that Ridenour was not a broker, but that, under the facts of the particular case, he was the mere agent of appellant for the purpose of purchasing the bond in question.

4. STATUTES: Blue Sky Act: "broker" defined.

Ridenour was granted a permit, under the statute, to engage in the business of a broker, and did so engage in such business. The fact that he was solicited by appellant to purchase the bond in question, instead of soliciting appellant to purchase the bond from him, would not deprive him of his character as a broker, under the statute. This was the business in which he was engaged, and for the purpose of this action he was none the less a broker because appellant was the moving party in the transaction.

IV. It is contended that Ridenour did not violate the terms and provisions of the act in the transaction in question, and that he was guilty of no fraud and did not make any false representation to appellant to induce the purchase of the bond in question.

The trial court was of the opinion that, under the evidence, Ridenour was guilty of violating the provisions of the act; and an examination of the record satisfies us that the court was correct in this conclusion. Ridenour obtained appellant's money by false representations and fraud, and, having so obtained it, converted the money and absconded. He clearly violated the provisions of the statute in question.

We reach the conclusion that the bond in question was required under the terms and provisions of the act, and that it inured to the benefit of appellant, or of any person who came within its scope.

It follows that the trial court erred in directing a verdict

in behalf of appellee, and the judgment appealed from must, therefore, be—*Reversed.*

ARTHUR, C. J., and PRESTON and STEVENS, JJ., concur.