UNITED STATES FIDELITY & GUARANTY CO. v. NAYLOR et al.

(Circuit Court of Appeals, Eighth Circuit. October 30, 1916.)

No. 4473.

*(Syllabus by the Court.)*

1. PRINCIPAL AND SURETY ⬦⟺192—"COSURETYSHIP"—TEST.

The test of cosuretyship is a common liability to the same party or parties for the same debt or duty. Such cosuretyship may arise out of the same writing or transaction, or out of several writings or transactions, at the same time, or at different times. It entitles the cosurety who has paid more than his just proportion of the common liability to contribution from his fellow cosureties who have paid less than their just proportion.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 578–590; Dec. Dig. ⬦⟺192.

For other definitions, see Words and Phrases, Second Series, Cosurety.]

2. PRINCIPAL AND SURETY ⬦⟺192—CONTRACTS—COSURETIES—WHO ARE.

D. and S., the owners of a bank, made their bond in the sum of $5,000, with a surety company as their surety, for its usual compensation for such suretyship, to a county, conditioned to account for and pay over on demand deposits of county funds made in the bank between January, 1902, and February, 1903, and the county accepted this bond February 3, 1902. S. sold and conveyed his interest in the bank to D. on March 1, 1902. On March 2, 1902, D., as principal, and five individuals, the personal sureties, without compensation other than the friendship of the principal, made their bond in the sum of $10,000, conditioned to pay over on demand deposits of the county funds made in the bank between January, 1902, and February, 1903, and this bond was accepted by the county March 3, 1902. D. told the personal sureties, before they signed their bond, that $5,000 of the deposits in the bank were secured by the bond of a surety company, and asked them to make their bond for him for the excess of the deposits above $5,000, and they did not intend to become liable for that $5,000. But there was no contract between them and the county, nor between them and the surety company, to that effect, and they signed their bond, which, by its terms, secured the entire deposits up to $10,000, without reading it. The bank failed in January, 1903, owing the county on account of deposits $9,443.67. The surety company was compelled to and did pay more than its just proportion of this debt.

*Held*, the two bonds secured the same debt, and the surety company and the personal sureties were cosureties for its payment, and the former was entitled to contribution from the latter.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 578–590; Dec. Dig. ⬦⟺192.]

⬦⟺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. PRINCIPAL AND SURETY ⊕194(1)—CONTRIBUTION—COMPENSATED AND AC-
COMMODATION SURETIES.

Where some cosureties for a common debt or duty were compensated,
but not indemnified, for their suretyship, and others became such for the
accommodation of their principal or principals, the compensated cosure-
ties, who have paid more than their just proportion of the common debt,
may have contribution of the accommodation cosureties.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§
605, 609, 610, 613, 614, 619, 620; Dec. Dig. ⊕194(1).]

4. PRINCIPAL AND SURETY ⊕196—CONTRIBUTION—BONDS FOR DIFFERENT
AMOUNTS.

Where there are several bonds for different amounts securing the
same debt or duty, and the surety on one of them pays more than his
proportion of the debt, the contribution between the cosureties on dif-
ferent bonds is in proportion to the penalties of their respective bonds.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 627–
631; Dec. Dig. ⊕196.]

5. PRINCIPAL AND SURETY ⊕196—CONTRIBUTION—INSOLVENT SURETIES.

In actions at law, where some of the cosureties liable to contribute are
insolvent, have died or are beyond the jurisdiction of the court, the sol-
vent sureties within its jurisdiction are liable for their respective aliquot
parts only of the amount all the sureties on their particular bond should
contribute.

But in suits in equity, where some of the sureties on a bond are in-
solvent, have died, or are beyond the jurisdiction of the court, the solvent
sureties on that bond are liable to contribute and pay, not only their
aliquot parts of the contribution due from the sureties on that bond, but
also the parts attributable to their cosureties on the bond who are in-
solvent, have died, or are beyond the jurisdiction of the court. They
are liable for the entire contribution due from all the sureties on their
bond.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§
627–631; Dec. Dig. ⊕196.]

6. PRINCIPAL AND SURETY ⊕196—CONTRIBUTION—EXPENSES.

Where several cosureties are liable for a common debt or default, and
none of them pays without suit, one who is sued, and compelled by the
judgment against him to pay court costs and expenses and interest, is
entitled to contribution on account of those costs and expenses and the
interest to the same extent that he is entitled to contribution on account
of the principal of the debt, provided his defense to the suit was not
frivolous, but was prudent and hopeful, though unsuccessful.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§
627–631; Dec. Dig. ⊕196.]

Trieber, District Judge, dissenting.

Appeal from the District Court of the United States for the District
of Kansas; John C. Pollock, Judge.

Suit by the United States Fidelity & Guaranty Company against
G. W. Naylor and others. From a decree dismissing the suit, com-
plainant appeals. Reversed and remanded, with directions.

Dickerson and Starrett were copartners doing business in Kansas under
the firm name of the Toronto Bank in January and February, 1902, and Dick-
erson continued to do business under that name until some time in January,
1903. On February 1, 1902, the bank was indebted to Woodson county, Kan.,
on account of county funds deposited with it, in the sum of $7,917.50, and it
remained indebted to the county in various amounts until on January 14,
1903, it failed owing the county $9,443.67. On February 3, 1902, the county
accepted and approved a bond of the copartners and the United States Fidel-

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ity & Guaranty Company as their surety in the sum of $5,000, conditioned that the bank should promptly pay over on demand all funds of the county deposited with it between January 30, 1902, and January 30, 1903. On March 3, 1902, the county accepted and approved a bond of the owner of the bank, Dickerson, and the defendants Naylor, Thompson, Hoggatt, Gilroy, and Braley, as sureties, in the sum of $10,000, conditioned that the bank should promptly pay over on demand all funds of the county deposited with it during the year commencing February 1, 1902, and ending February 1, 1903. The slight difference in the date of the commencement and conclusion of the terms of the two bonds made no difference in the actual debt secured thereby. The county sued the Fidelity Company on its bond, and recovered the full penalty thereof and interest thereon, amounting to $6,027.30. The Fidelity Company paid this amount, $536.40 court costs and expenses and claimed to have expended $1,000 for counsel fees in that litigation. Out of the assets of the bank the receiver paid to the county $1,669.02 on the debt of the bank, and the remainder owing by the bank, which amounted to about. $2,300.22, the sureties on the $10,000 bond paid. The Fidelity Company brought this suit in equity against the sureties on the latter bond for an accounting and contribution, on the theory that they were cosureties with it for the payment of the same debt. During the pendency of the suit the defendant Braley died, and Josie C. Braley, his sole heir, who succeeded to all his property, real and personal, was substituted for him as a defendant. Those alleged to be liable to contribute on account of the bond for $10,000, who are hereafter called the personal sureties, answered, among other things: First, that the bond which they signed was not given to secure the same debt as was the $5,000 bond made by the Fidelity Company, that the latter bond was given to secure the indebtedness of the bank to the county to the amount of $5,000, and the former was given to secure the indebtedness of the bank to the county for the amount in excess of that $5,000; and, second, that the Fidelity Company, in addition to the deposit of the county funds in the bank, received a money consideration for the making of its bond, while the only consideration which the personal sureties received was the deposit of the county funds in the bank to an amount not exceeding $5,000, in addition to the $5,000 which the bank had the right to receive on account of the bond of the Fidelity Company. There was a final hearing of the case upon the pleadings, an agreed statement of facts and the testimony of a few witnesses, and upon it the court sustained the two defenses stated above, and upon that ground dismissed the suit on its merits.

A. M. Keene and W. W. Padgett, both of Ft. Scott, Kan., for appellant.

G. H. Lamb and W. E. Hogueland, both of Yates Center, Kan., for appellees.

Before SANBORN and CARLAND, Circuit Judges, and TRIEBER, District Judge.

SANBORN, Circuit Judge (after stating the facts as above). [1] The test of cosuretyship is a common liability for the same debt or burden. This liability may arise at the same time or at different times, out of the same writing or out of many writings. A common interest and a common burden alone are required to create the relation, and to enable the cosurety who has paid more than his due proportion to claim contribution from those who have paid less than their just proportion of the common liability. "If several persons, or several sets of persons, become sureties for the same duty or debt, of, to, and for, the same persons, though by different instruments, at different times, and without a knowledge of the obligations of each other, they will be bound to mutual contribution." 2 Wait's

Actions and Defenses, 297; 4 Pomeroy's Equity Juris. § 1418; Assets Realization Co. v. American Bonding Co., 88 Ohio St. 216, 102 N. E. 719, 720, 725; Dering v. Earl of Winchelsea, 1 Cox's Chan. Cases, 318, 322, 323.

[2] The first question, then, is: Was the bond of the personal sureties given to secure the same liability as the bond of the Fidelity Company? The evidence from which the answer to this question must be deduced consists of the two bonds, the judgments on the bonds, the testimony of Mr. Gilroy, one of the personal sureties, the stipulation that his testimony shall be considered the testimony of the sureties Thompson, Hoggatt, and Naylor, and the testimony of Mr. Gustin, one of the county commissioners. Mr. Gilroy testified that Mr. Dickerson, the principal in the bond the personal sureties signed, told him about March 2, 1902, that he had $5,000 of the county's money that was secured by a bond in a trust company; that he could get more money if he could get more bond; that there would not be much of the time when he would have more than $5,000 of the county's money, but that he had to give a bond to secure it; that Dickerson asked him to sign the bond for the bank; that as a result of this conversation and solicitation he signed the bond for $10,000 without, as he thinks, reading it; that he had no intention of becoming liable for the $5,000 already guaranteed by the Fidelity Company; and that he could not answer the question whether or not he would have signed the bond if the matter had been presented to him as a proposition to sign as additional surety for the $5,000 already guaranteed by the Fidelity Company. Mr. Gustin, the county commissioner, testified that the $5,000 bond was approved by the commissioners February 3, 1902; that on January 1, 1902, the bank was indebted to the county for the county funds deposited with it in the sum of $10,868.20; that after the $5,000 bond was approved Dickerson made application for an additional deposit over and above the $5,000 secured by the Fidelity Company's bond; that the board issued an order to allow him additional money above the $5,000 if he would give another bond, and instructed the county treasurer to deposit nothing above the $5,000 with his bank until the board received more bond to cover the amount the bank should receive; that the board knew when it met that the bank had on hand more than its proportion, and that was one of the things they met for, to give this order that he should give more bond; that they gave the county attorney the facts upon which to prepare the bond; that he prepared it, and the board examined the names of the sureties. There was no other material testimony upon this issue.

The result is that the facts were that the bank had more than $5,000 of the county funds when the county board met and Dickerson asked for more deposits; that the board then knew this fact, and that it had met to make the order that Dickerson should give more bond; that these facts were stated to the county attorney; that the county attorney drew the bond, and the personal sureties signed it without reading it. The bond was signed March 2, 1902, and it was approved March 3, 1902. If it had been given to secure only addi-

tional deposits to be subsequently received by the bank on the faith of this bond, the county attorney, on the state of facts which were given to him, would surely have so drawn it as to limit the liability of the sureties to the repayment of the deposits made subsequent to its date. The facts were, and doubtless they were so stated to him, that the bank was on February 1, 1902, and had been, indebted to the county in more than $5,000; that the board had made the demand of more bonds of the owners of the bank, and the county attorney so drew the bond that the sureties on it covenanted to repay all deposits made in the bank subsequent to January 31, 1902, a date more than a month prior to the date of the signing of the bond by the sureties. There can, therefore, be no doubt that the bond was given to secure all deposits after January 31, 1902, until January 31, 1903. The sureties, therefore, by the express terms of the bond covenanted promptly to pay over on demand the funds of the county deposited with the bank between January 31, 1902, and February, 1903. The bank defaulted in January, 1903. Hence the bond of the personal sureties by its clear terms secured the same debt as the bond of the Fidelity Company.

It is true that Dickerson told the personal sureties before the bond was signed that it secured only the deposits in excess of $5,000, that they signed it in reliance upon that statement, and did not intend thereby to become liable to pay the $5,000 for which the Fidelity Company had become liable. But Dickerson was neither the agent nor representative of the county nor of the Fidelity Company. The personal sureties were charged with the duty as against the county and as against the Fidelity Company to read the bond before they signed it, and if it did not accord with their intentions to modify it so that it did before they executed it. Insurance Co. v. Mowry, 96 U. S. 544, 547, 24 L. Ed. 674; Chicago, St. P., M. & O. Ry. Co. v. Belliwith, 28 C. C. A. 358, 362, 83 Fed. 437, 441. It is conceded that by an agreement between themselves and the county, or by a contract between themselves and the Fidelity Company, they might have limited their liability to the repayment of deposits in excess of $5,000; but they did not do so. And the question here is, not what they might have done, but what they did, and there is nothing in the testimony in this case to overcome the incontrovertible fact, which the two bonds conclusively establish, that each surety on each bond covenanted to pay, up to the amount of the penalty of the bond he or it signed, the entire deposits in the Toronto Bank of the funds of the county between January, 1902, and February, 1903. The bond of the personal sureties was given to secure the same debt as the bond of the Fidelity Company.

This conclusion has not been reached without notice of other contentions of counsel for the personal sureties which have not yet been discussed. They call attention to minor differences in the verbiage of the two bonds, such as that the Fidelity Company's bonds secured the deposits of the county, while the personal sureties' bond secured these deposits and also 2 per cent. interest on daily balances, guaranteed that the bank would do all business of exchange on checks and drafts

without charge, and that it would make all reports required by law; that the surety company's bond guaranteed the payment of all checks and drafts of the treasurer of Woodson county, while the personal sureties guaranteed the payment of all warrants, checks, and drafts legally drawn on said fund; and that the Fidelity Company's bond ran to the board of county commissioners, and the bond of the personal sureties to the county treasurer. All these and other objections of the same class specified in their brief have received consideration. But there was no defalcation of payment of interest on deposits, and none of these objections relates to any accrued liability to the county of any of the sureties, or in any way challenges the controlling fact that each bond and every surety on each bond was bound by the bond he or it signed to pay, up to the penalty of the bond, to the county the debt for its deposits which has occasioned this litigation. The foregoing suggestions are therefore immaterial.

Counsel argued that the principals in the bond were not the same, because "the body corporate, the Toronto Bank," was specified as principal in the Fidelity Company's bond, and that bond was signed by "The Toronto Bank, W. P. Dickerson, Cashier," while "The Toronto Bank, W. P. Dickerson and C. H. Starrett, as owners of said bank," is named as principal in the personal sureties' bond, and it is signed as principal by W. P. Dickerson, who, at the date of his signature on March 2, 1902, had purchased and become the owner of the interest of Starrett in that bank. But the contention is baseless, for the personal sureties in their answer and in the stipulation of facts admitted that the Toronto Bank was owned by W. P. Dickerson and C. H. Starrett, doing business as partners under its name in the year 1902, until on March 1st in that year Dickerson purchased the interest of Starrett therein, and the condition of the bonds was that the respective sureties thereon would pay over on demand the county funds deposited in that bank between January, 1902, and February, 1903, and the bank continued in operation and received deposits until its defalcation in January, 1903.

They invoke the rule that sureties for joint principals are not liable for one of them acting independently, or after subsequent changes are made in the members of the firm, or by the dissolution thereof, and argue from these propositions that the personal sureties were not liable for the same debt as the Fidelity Company. There are two reasons why this position is untenable: First, the change in the membership of the Toronto Bank by the purchase by Dickerson of Starrett's interest was made on March 1, 1902, the personal sureties did not sign their bond until March 2, 1902, and by the terms of that bond they covenanted to repay all the deposits of county funds in the bank between January, 1902, and February, 1903, although the bank was owned by Dickerson when they made their bond, and it had been owned by Dickerson and Starrett before that date, and they knew it; and, second, prior to the making of the personal sureties' bond Dickerson and Starrett had contracted with the county to repay to it all deposits of its funds with the Toronto Bank made between January, 1902, and February, 1903, and the personal sureties knew that fact. With knowl-

edge of this fact they covenanted in their bond to repay to the county the deposits made by the county with that bank during the same time, and where sureties have become liable for the performance of a particular contract by a partnership, its subsequent dissolution before the completion of the contract will not release them from liability for each of the former partners so far as that particular contract is concerned. Abbott v. Morrissette, 46 Minn. 10, 48 N. W. 416; Freeman v. Berkey, 45 Minn. 438, 440, 48 N. W. 194; Kaufmann v. Cooper, 46 Neb. 644, 650, 65 N. W. 796. The Fidelity Company, notwithstanding the subsequent sale by Starrett of his interest in the firm to Dickerson, remained liable on its bond for the repayment of the funds of the county deposited with the bank between January, 1902, and February, 1903, and the personal sureties, by their execution of their bond subsequent to the sale of Starrett's interest to Dickerson, by the clear terms of the covenants therein, made themselves liable for the same debt. No logical or rational avenue of escape is perceived from the conclusion that the bond of the personal sureties was given to secure the same debt as that of the Fidelity Company, and this conclusion is verified by the fact that in the strenuously contested action of U. S. Fidelity & Guaranty Co. v. Woodson County, 145 Fed. 144, 76 C. C. A. 114, in the court below, that court adjudged the Fidelity Company liable to pay these deposits up to the amount of the penalty of its bond, and that judgment was approved by this court, and in a similar action by Woodson county against the personal sureties, Naylor, Thompson, Gilroy, and Hoggatt, on their bond, a judgment was rendered against them for the part of the deposits in the Toronto Bank secured by both bonds that was not paid by the Fidelity Company and others.

[3] The next contention of the counsel for the personal sureties is that, although they were liable for the same debt as was the Fidelity Company, the latter is not entitled to contribution from them, because it received a money consideration for assuming its liability, while they received nothing but the deposit of the moneys of the county with their friends Dickerson and Starrett, for whose accommodation they signed their bond. The argument is that the right to contribution rests on principles of equity, and primarily on the thought that equality is equity, and that the personal sureties are not placed on an equality with the Fidelity Company if they are required to pay their proportion of the common debt, because they received nothing for their obligation but the accommodation of their friends, while the company received its regular premium for its suretyship. The record fails to disclose the amount paid to the Fidelity Company for its bond, nor does it show what the value in actual, substantial, or sentimental benefit the friendship of the owners of the bank, doubtless induced or fostered by the accommodation of the personal sureties, was to these sureties, so that the court cannot, if it would, place these parties on an absolute equality. Certain it is, however, that its refusal to compel contribution from the personal sureties would, even if the amount of money received by the company for its suretyship were known, result in the payment by the Fidelity Company of thousands of dollars more, and the payment by the personal sureties of thousands of dollars less, than

their just and lawful proportion of the common liability, and would leave these parties in a more gross and unjust inequality than the enforcement of contribution.

The true answer to this contention of counsel, however, is that the principle and practice of contribution among cosureties are neither founded upon nor do they require absolute equality among the sureties. They do not undertake to investigate, review, reform, or give consideration to the motives, considerations, or inducements that caused the cosureties to become such, nor do they attempt to equalize the contracts they made, and for that reason the consideration, or the lack of it, which sureties may have received, except where they receive practical indemnity, is immaterial. The principle and practice of contribution take the cosureties as they find them after their contracts have been made, and they are founded on the proposition that, where some of such cosureties have paid more than their proportion of the common liability, it is just and equitable that those who have paid less than their proportion thereof should contribute to the former sufficient to make the proportion paid by each cosurety just and equitable. Hence, where some of the cosureties for a common debt have been compensated, but not indemnified, for their suretyship, and others became cosureties for the accommodation of their principals, that fact is immaterial, and the compensated cosureties, who have paid more than their proportion of the common liability, are entitled to contribution from the accommodation cosureties. United States Fidelity & Guaranty Co. v. McGinnis, 147 Ky. 781, 145 S. W. 1112, 1115; Frost on Guaranty Insurance, § 284; Lewis, Adm'r, v. United States Fidelity & Guaranty Co., 144 Ky. 425, Ann. Cas. 1913A, 564, 138 S. W. 305, 306; Fidelity & Deposit Co. v. Phillips, 235 Pa. 469, 84 Atl. 432, 434. If the rule were otherwise it would necessarily follow that an accommodation cosurety who had paid more than his proportion could not have contribution from a compensated cosurety, for the inequality suggested inheres in the contracts and exists in one situation as well as in the other. And the conclusion is that the Fidelity Company may have contribution from the personal sureties.

[4] Many other questions relevant to the settlement of the decree which must be rendered have been discussed by counsel in their briefs and have been considered by the court, and our opinion upon them will be briefly stated. Both bonds were given pursuant to section 1704, General Statutes of Kansas 1901, which provides that when the bond of a surety company is given it must be "in an amount aggregating the largest sum which may be on deposit at any one time," and that when a personal bond is given "it must be double the largest approximate amount that may be on deposit at any one time." Counsel for the personal sureties cite this section, and contend that, because the personal bond of $10,000 must be presumed to have been given for double the amount that might be on deposit at any one time and the bond of the Surety Company for $5,000 for only the amount of such deposit, each of the bonds was given for only $5,000, and the proportion of the common debt which the Fidelity Company should pay is the same as that which the personal sureties should pay. The proposition cannot

be sustained. Notwithstanding the provisions of the statute, the personal sureties expressly covenanted to pay the common debt to the amount of $10,000, and the Fidelity Company covenanted to pay it to the extent of $5,000 only, and the proportion of it which the personal sureties should pay is two-thirds, and that which the Fidelity Company should pay is one-third, of the debt. Where there are several bonds securing the same debt, and the surety or sureties on one of these pays more than his proportion of the debt, the contribution between the sureties must be in proportion to the penalties of their respective bonds. Story's Equity Jurisprudence, par. 497; Armitage v. Pulver, 37 N. Y. 494; Jones v. Blanton, 41 N. C. 115, 51 Am. Dec. 415; Loring v. Bacon, 57 Mass. (3 Cush.) 465, 468; Dering v. Winchelsea, 2 Bos. & Pul. 270; Bosley v. Taylor, 35 Ky. (5 Dana) 157, 30 Am. Dec. 677; Moore v. Boudinot, 64 N. C. 190.

[5] Another question is whether the solvent sureties on the $10,000 bond within the jurisdiction of the court are liable to pay the entire amount which the sureties on that bond should contribute, although some of the sureties are insolvent, or beyond the jurisdiction of the court, or may escape by paying only their aliquot part of the amount which all the sureties on that bond were liable to contribute. The answer is that while in an action at law, where some of the sureties liable to contribute have died, or are beyond the jurisdiction of the court, or are insolvent, the solvent sureties within the jurisdiction of the court are liable for their respective aliquot parts only of the amount which all the sureties on that particular bond are liable to contribute, the rule is otherwise in equity. In suits in equity the solvent sureties within the jurisdiction of the court are liable to contribute the entire amount which all the sureties on their particular bond were liable to contribute, where some of the sureties are insolvent, or have died, or are beyond the jurisdiction of the court. And the court in equity may render its decree for the payment by the respective sureties of the amounts they owe, and retain jurisdiction of the case and render supplemental decrees until the entire amount which all the sureties were liable to contribute has been paid by the solvent sureties, or some of them. In the case at bar the solvent sureties within the jurisdiction of the court are liable to pay the entire amount which all the sureties on the bond of the personal sureties would have been liable to contribute, if they had all been alive, solvent, and within the jurisdiction of the court below. 1 Story's Equity Jurisprudence (13th Ed.) § 496; Gross v. Davis, 87 Tenn. 226, 11 S. W. 92, 93, 10 Am. St. Rep. 635; Riley v. Rhea, 5 Lea (Tenn.) 115; Brandt on Suretyship & Guaranty, § 314; Boutin v. Etsell, 110 Wis. 276, 85 N. W. 964, 965; Smith v. Mason, 44 Neb. 610, 63 N. W. 41; Stallworth v. Preslar, 34 Ala. 505; Werborn's Adm'r v. Kahn, 93 Ala. 201, 9 South. 729; Faurot v. Gates, 86 Wis. 569, 57 N. W. 294; Hardell v. Carroll, 90 Wis. 350, 63 N. W. 275.

[6] The Fidelity Company alleged that, at the conclusion of the action of the county against it, it was compelled to and did pay $536.40 in court costs and expenses and $1,000 in attorney's fees that were reasonably and fairly worth $1,000 in the conduct of that liti-

gation. The personal sureties admitted the averment regarding the court costs and expenses, but denied that regarding attorney's fees, and the record contains no proof of the payment of the attorney's fees, or of their value. On account of the absence of any such proof, the attorney's fees cannot be allowed, and the discussion concerning them is disregarded. Is the Fidelity Company entitled to contribution from the personal sureties to the payment of the court costs and expenses in the suit of the county against it which it was compelled to pay? When the bank defaulted, and the principals in the bonds failed to pay on demand their debt to the county, it was the duty of the personal sureties toward the Fidelity Company to pay two-thirds of that debt, and it was the duty of the Fidelity Company toward the personal sureties to pay one-third of it. "By becoming sureties," said Appleton, C. J., "each impliedly promised the other that he would faithfully perform his part of the contract and pay his proportion of loss in case of the insolvency of .the principal." Hichborn v. Fletcher, 66 Me. 209, 210 (22 Am. Rep. 562). And it was the duty of the personal sureties towards the county to pay the entire debt, because that debt was less than the $10,000, the penalty of their bond, while it was equally the duty of the Fidelity Company towards the county to pay $5,000 of the debt. None of the sureties paid anything without suit. The county sued the Fidelity Company, recovered judgment, and compelled it to pay $536.40 court costs and expenses of that litigation. The personal sureties might have prevented that suit and those costs and expenses by the simple discharge of their duty, by the payment of the debt which they had agreed with the county to pay, and probably by the payment of their two-thirds of it. The defense which the Fidelity Company made to the suit against itself was not frivolous, although it did not prevail. It presented serious issues of law and of fact, was prudent and hopeful, one which counsel might well have made with reasonable expectation that it might succeed. United States Fidelity & Guaranty Co. v. Woodson County, 145 Fed. 144, 76 C. C. A. 114. In this state of the case the Fidelity Company is entitled to contribution from the personal sureties on account of its payment of these court costs and expenses, and for like reason it is entitled to contribution on account of the interest, which was included in the judgment against it and which it also paid, to the same extent that it is entitled to contribution on account of the principal of the debt. Where several cosureties are liable for a common debt or default, and none of them pays without suit, one who is sued and compelled to pay the judgment, to pay court costs, expenses, and interest, is entitled to contribution on account of those costs and expenses and that interest to the same extent that he is entitled to contribution on account of the principal of the debt he has paid, provided his defense to the suit was not frivolous, but was prudent and hopeful, though unsuccessful. Carter v. Fidelity & Deposit Co., 134 Ala. 369, 32 South. 632, 633, 92 Am. St. Rep. 41; Fletcher v. Jackson, 23 Vt. 581, 593, 56 Am. Dec. 98; Gross v. Davis (Tenn.) 11 S. W. 92, 93, 10 Am. St. Rep. 635; 1 Brandt on Suretyship & Guaranty (3d Ed.) § 309; Davis v. Emer-

son, 17 Me. 64; Boutin v. Etsell, 110 Wis. 276, 85 N. W. 964, 965; Backus v. Coyne, 45 Mich. 584, 8 N. W. 694; Van Winkle v. Johnson, 11 Or. 58, 5 Pac. 922, 924, 50 Am. Rep. 495; Briggs v. Boyd, 37 Vt. 533, 536.

We turn to the facts of the case and the liabilities which they establish and limit. The evidence satisfies that C. H. Starrett was a principal and not a surety on the bond of the Fidelity Company, that he never signed and was not a party to the bond of the personal sureties, that any cause of action which any of the parties to this suit ever had, or might have had, against Odenia E. Starrett as administratrix of his estate, or against her, Nina E. Hull, Chas. Sidney Starrett, Clyde Horace Starrett, Marion Fedora Starrett, and Hazel Fern Starrett, as the heirs at law of C. H. Starrett, is barred by the statute of limitations, and that as against them this suit should be dismissed on its merits.

The fact that the Fidelity Company did not present and prosecute a claim against the estate of Starrett in the probate court to compel the payment of Starrett's liability to the county does not constitute such laches as bars its recovery in this suit against its cosureties. The duty of the personal sureties to prosecute such a claim was as imperative as was that of the Fidelity Company, and the latter company had not paid anything on account of its bond, and therefore had no accrued and due cause of action against the estate or the heirs of Starrett prior to the time when the statute of limitations had run against the claims against the estate.

As between the Fidelity Company and the defendant Josie Braley, the evidence satisfies that the Fidelity Company has the right to a decree for the payment by her of such an amount, not exceeding $700, the value of the estate of the surety, F. C. Braley, deceased, which came to the hands of Josie Braley as his heir, as may be required to complete the payment of his proportion of the common debt of the cosureties on account of which he paid $740.63 on February 3, 1903. But as between Josie Braley and the defendants G. W. Naylor, E. T. Thompson, J. R. Hoggatt, and Z. Gilroy, the latter agreed with F. C. Braley in his lifetime, and are legally liable, to pay, as against him and Josie Braley, his sole heir, the amount for which F. C. Braley was, or Josie Braley is, or may be, liable to the Fidelity Company, or any other party, on account of the bond of the personal sureties.

The record establishes the fact that the common debt of the cosureties to the county has been paid in part out of the assets of the bank, in part by the principal Starrett, and in part by the cosureties. The amounts paid by the cosureties were as follows:

F. C. Braley, on February 3, 1903.................................... $  740.62
G. W. Naylor, on December 31, 1904................................      389.90
E. T. Thompson on December 31, 1904.............................      389.90
Z. Gilroy, on December 31, 1904....................................      389.90
J. R. Hoggatt, on December 31, 1904..............................      389.90
The Fidelity Company, on June 7, 1906..........................    6,563.30

The date when Naylor, Thompson, Gilroy, and Hoggatt paid appears in their pleading and in the agreed statement of facts to be

on the ——— day of ——— 1904, and as the burden was on them to prove the date the court assumes that they made their payment on the last day of that year. Crediting the personal sureties with interest on the amounts they respectively paid from the dates of their respective payments until June 7, 1906, when the Fidelity Company made its payment, in order to place them on an equality, as nearly as may be, with that company, their payments as of that date were:

| | |
|---|---:|
| F. C. Braley | $ 851.99 |
| G. W. Naylor | 419.53 |
| E. T. Thompson | 419.53 |
| Z. Gilroy | 419.53 |
| J. R. Hoggatt | 419.53 |
| Aggregate | $2,530.11 |
| The Fidelity Company paid | 6,563.30 |
| All the sureties paid | $9,093.41 |

The personal sureties should have paid two-thirds of the amount which all the sureties were required to pay, or $6,062.27, and the Fidelity Company should have paid one-third of the amount that all the sureties were required to pay, or $3,031.14. The Fidelity Company, therefore, paid on June 7, 1906, $3,532.16 more than its just and equitable proportion of the common debt, and the personal sureties had paid as of that date $3,532.16 less than their proportion thereof, and the Fidelity Company is consequently entitled to a decree for the recovery of $3,532.16, interest thereon from June 7, 1906, to the date of the entry of the decree, and the costs of this suit, from the defendants Naylor, Thompson, Gilroy, and Hoggatt, jointly and separately, until the full amount is paid, and to an execution to enforce this recovery. And in case the full amount decreed to be owing by Naylor, Thompson, Gilroy, and Hoggatt is not and cannot be collected of these four sureties, or either of them, then the Fidelity Company is entitled to a decree against Josie Braley for the sum of $700, or such part of this $700 as shall be required to completely satisfy the decree against Naylor, Thompson, Gilroy, and Hoggatt.

Let the decree below be reversed, and let this case be remanded to the District Court, with instructions to enter a decree in favor of the Fidelity Company and to take further proceedings in this suit in pursuance of the views expressed in this opinion.

TRIEBER, District Judge (dissenting). I am constrained to dissent from so much of the majority opinion which holds that the appellees are liable to contribute two-thirds of the amount due from the two bonds, and from that part of the opinion which holds that they are liable for any part of the costs paid out by the appellant in the suit brought by the county. In my opinion each of the bonds must be treated as being for the sum of $5,000, and therefore the sureties on each of the bonds are liable for one-half. The statute of Kansas under which these bonds were executed (section 1704, General Statutes of Kansas 1901) reads as follows:

"*Deposit of Money in Other Counties.*—That in all counties having a population of less than twenty-five thousand inhabitants, the county treasurer may deposit all public moneys in some responsible bank or banks within the state of Kansas, to be designated by the board of county commissioners, in the name of said treasurer as such officer, which bank or banks shall pay such interest on average daily balances as may be agreed upon by the board of county commissioners: Provided, that in no case the rate of interest shall be less than two per centum per annum on such average daily balances. Before making such deposits, the said board shall take from said bank or banks a good and sufficient bond in a sum double the largest approximate amount that may be on deposit at any one time, or the bond of some surety company empowered to do business in the state of Kansas, in a sum aggregating the largest sum which may be on deposit at any one time, conditioned that such deposits shall be promptly paid on the check or draft of the treasurer of said county; but in no case shall more than one-half of the amount of said bond be subscribed by the officers of said bank; and such bank or banks shall, on the first Monday of each month, file with the county clerk of such county a statement of the amount of money on hand at the close of business each day during the previous month, and the amount of interest accrued thereon to said date: Provided, that it shall be unlawful for the board of county commissioners of any county to deposit any funds of their county in any bank in which the county treasurer, or any member of the board of county commissioners, shall be the owner of any stock or otherwise pecuniarily interested therein."

It seems to me that there can be no room for doubt that the liability of the appellees was only for $5,000, although the bond being executed by individuals, and not by a surety company empowered to do business in the state of Kansas, it had to be for double the amount of the largest approximate amount that may be on deposit at one time. The deposits by the first order, when appellant executed its bond, were limited to $5,000, and later the deposits were increased by an additional $5,000, making the largest amount which could be deposited with the Toronto Bank $10,000, secured by the two bonds, or $5,000 for each. I can hardly conceive that it was the intention of the Legislature of the state of Kansas to place a greater burden on its own citizens, who would sign bonds merely for accommodation, than on foreign corporations, engaged in the business of becoming sureties on bonds, for compensation. To me the language of the statute is plain that the sole object of requiring the penalty of the bond to be double the amount of liability which could possibly accrue, when the bond is signed by individuals, was that it would make the bond safer, and thus protect the county from loss, in case of the insolvency of some of the sureties; while, on the other hand, if the bond is executed by a surety company, which was absolutely safe by reason of its compliance with the laws of the state of Kansas, there was no likelihood of inability to respond to any loss for which it may become liable. Had the second bond been also signed by a surety corporation, the penalty would only have been $5,000, and appellant could in that case have asked for contribution of one-half only. The effect of the majority opinion is as if the Toronto Bank had been required to give a bond for $15,000, and appellant had assumed responsibility for $5,000 and appellees for $10,000. As this was not what either the statute or the orders of the board of commissioners required, my opinion is that appellees are only liable for one-half of the amount paid by appellant on its bond, less one-half paid by them.

On the question of contribution of costs, the law, as I understand it, is that when one of the sureties is sued, and in good faith contests the suit, with reasonable cause to believe that the defense is good in law, and the result of the contest, if favorable to that surety, would inure to the benefit of his cosureties, whether parties to that action or not, he is entitled to contribution for the costs and attorney's fees necessarily expended by him, although he may not be successful, or if the cosureties are as responsible for the necessity of a suit, by reason of a refusal to pay, as the surety sued is. On the other hand, if the claim is contested by the surety upon grounds which would inure solely to his own benefit if successful, and by reason thereof, in all likelihood, throw a greater burden on his cosureties, or its success could in no event benefit them, such a surety is not entitled to contribution from his cosureties for the costs and attorney's fees paid out by him in defense of the action.

The authorities cited in the majority opinion are clearly distinguishable from the facts in the instant case. In Carter v. Fidelity Deposit Co., 134 Ala. 369, 32 South. 632, 92 Am. St. Rep. 41, the facts were that the surety seeking contribution had resisted the suit, which was to recover $23,063.51, and by reason of the contest the claim was reduced to $13,797.69, a saving of nearly $10,000, of which the cosureties were the beneficiaries, as much as he was.

In Fletcher v. Jackson, 23 Vt. 581, 56 Am. Dec. 98, it was held:

"Whether the costs and attorney's fees may be recovered depends altogether on the question of whether such defenses were made under circumstances as to be regarded as hopeful and prudent."

If the suit was needless, neither attorney's fees nor costs can be recovered. John v. Jones, 16 Ala. 454.

In Gross v. Davis, 87 Tenn. 226, 11 S. W. 92, all the sureties made a common defense, and counsel were employed by the plaintiff for the benefit of all the sureties, with their knowledge and consent. The defense was for the benefit of all the sureties, and, if successful, would have benefited his cosureties fully as much as him.

Brandt on Suretyship and Guaranty, § 309, says:

"Whether the surety can recover from his cosureties contribution for costs of a suit from him, for collection of a debt, depends upon the circumstances of each case."

In Davis v. Emerson, 17 Me. 64, the court found:

"The failure to pay, which occasioned the costs, was imputable to the defendant, as much as to the plaintiff."

And therefore it was held that the defendant was liable for half the costs.

In Boutin v. Etsell, 110 Wis. 276, 85 N. W. 964, a surety was permitted to recover attorney's fees paid by him to make a compromise of the liability assumed by all the sureties. A very favorable compromise was effected and a considerable sum of money saved to all the parties. The court upon these facts held that the defendant ought to contribute toward the expenses incurred by the plaintiff in good faith, of which they were beneficiaries as much as he was.

In Backus v. Coyne, 45 Mich. 584, 8 N. W. 694, the court said:

"The foundation for the right of contribution in such cases (employment of counsel and costs of suit) is the fact that the expense was incurred in defending for the common benefit. This will not, therefore, permit him to incur expense in uselessly resisting a legal demand, or in creating needless or unnecessary costs and expenses."

In Van Winkle v. Johnson, 11 Or. 58, 5 Pac. 922, 50 Am. Rep. 495, the general rule that a surety, who defends in good faith for the benefit of all the sureties, is entitled to contribution from his cosureties is followed.

In Briggs v. Boyd, 37 Vt. 533, there was no question but that the defense, if successful, would have inured to the benefit of all the sureties.

In this case the defense made by the appellant in the suit of the county against it (United States Fidelity & Guaranty Co. v. Board of Com'rs of Woodson County, 145 Fed. 144, 76 C. C. A. 114) could in no wise have benefited the appellees, if it had succeeded. In fact it would have thrown a greater burden on them, because the appellant would have been relieved of all liability, and the appellees would have been responsible for the entire amount of the bond. The defenses made by the appellant in that case, as shown by the pleadings, which are a part of the record of this case, were:

A demurrer assigning as grounds: (1) That the court had no jurisdiction of its person. (2) That it had no jurisdiction of the subject-matter of the action.

The demurrer having been overruled, it answered, denying all liability upon the following grounds: (1) That the application for the bond by the bank falsely represented it as a corporation, when in fact it was a partnership. (2) That the bond by its express terms bonded the bank as a corporation when in fact it was a private bank, and that the board of county commissioners knew of this fraud at the time the bond was executed. (3) That one of the owners of the bank had sold his interest in the bank to his partner, without the knowledge or consent of the surety company, although that fact was known to the board of county commissioners. (4) That the board of county commissioners, after the execution of the bond by appellant had accepted a new bond in the sum of $10,000; "the bond" referred to being the bond signed by the appellees.

Which of these defenses, if successful, could have benefited the appellees? There can be but one answer to this: None. On the contrary, if the surety company had been successful, it would have been free from all liability, and the entire burden of the failure of the depositary bank would have fallen upon the appellees.