ROBERT L. LEACH, State Superintendent of Banking, Appellee, v. COMMERCIAL SAVINGS BANK OF DES MOINES, Appellee.

STATE OF IOWA et al., Appellees, v. CONTINENTAL CASUALTY COMPANY OF HAMMOND, INDIANA, et al., Appellants.

April 7, 1927.

Petition for Rehearing Dismissed by Petitioner
April 3, 1928.

*Clark & Byers,* for John A. Elliott, C. F. Frazier, Johnson Brigham, E. G. Linn, Mildred Hager Elliott, Rey Hager Martin, Ellen M. Hager, Harry A. Elliott, Philanda Hall, and Julia Closson, appellants.

*Havner, Flick & Powers,* for F. C. Waterbury, appellant.

*Sargent, Gamble & Read,* for Continental Casualty Company of Hammond, Indiana, appellant.

*Carr, Cox, Evans & Riley,* for American Surety Company of New York, appellant.

*Stipp, Perry, Bannister & Starzinger*, for Fidelity & Deposit Company of Maryland, appellant.

*Bradshaw, Schenk & Fowler*, for Royal Indemnity Company of New York, appellant.

*Parrish, Cohen, Guthrie & Watters*, for Federal Surety Company of Davenport and Detroit Fidelity & Surety Company of Detroit, Michigan, appellants.

*Miller, Kelly, Shuttleworth & McManus*, for Maryland Casualty Company of Baltimore, Maryland, appellant.

*Sullivan, Rippey & Sullivan*, for Ed. J. Raymond, appellant.

*Ben J. Gibson*, Attorney-general, and *S. S. Faville* and *Maxwell A. O'Brien*, Assistant Attorney-generals, for Robert L. Leach and L. A. Andrew, appellees.

*George Cosson*, for the State and R. E. Johnson, Treasurer of State, appellees.

*Charles Hutchinson*, for Independent School District of Des Moines, appellee.

STEVENS, J.—I. The appellants were officers and directors of the Commercial Savings Bank of Des Moines, Iowa, which, because of insolvency, was closed on December 31, 1924, and its assets taken over by the state superintendent of banking, as receiver. At the time the bank closed, it was indebted to the state of Iowa, as a depositary of public funds, in the sum of $253,576. The state on that day held bonds of corporate surety companies, aggregating $275,000, and a private bond signed by all appellants, as sureties, in the sum of $500,000. On February 3, 1925, the superintendent of banking commenced an action on the bonds of the several surety companies and upon the private bond. All of the corporate surety companies filed cross-petitions against the sureties on the private bond, demanding contribution. Judgment was entered against the bonding companies and the sureties on the private bond on July 15, 1925, except the appellant Waterbury, who was not then a party to the record. The judgment in favor of the state was paid to the treasurer by

the corporate surety companies October 28, 1925. In August, 1926, the aforesaid bonding companies filed a motion in the cause, asking pro-rata contribution from the sureties on the private bond, and for judgment against them. Judgment was entered, as prayed, in the sum of $137,444.15, and the sureties appeal. The case against F. C. Waterbury was tried subsequent to that of the other sureties, and a separate judgment entered against him for the above sum, and his appeal therefrom is based upon a separate and somewhat different record. Because, however, of the identity of the obligation and of most of the propositions relied upon for reversal, we shall, for convenience, dispose of these appeals in one opinion.

Most of the matters argued by counsel have been fully considered and decided in another opinion filed at the present sitting, under the same title.

Prior to the commencement of the second term of W. J. Burbank as treasurer of state, in January, 1923, the Commercial Savings Bank had been a depositary of public funds, and had executed a private bond in the penal sum of $500,000 to the state, to secure the same. This bond was renewed by the bond in suit, and approved by the executive council January 19, 1923. At the same time, bonds of three corporate surety companies aggregating $145,000 were also approved. No further bonds were given until June 5, 1923, when corporate surety bonds aggregating $370,000 were approved by the executive council. Five of the latter bonds by their terms expired in September, 1923. On the same day, the executive council approved a deposit of collateral of the Commercial Savings Bank with the National City Bank of Chicago as further security for the public funds deposited by the treasurer of state in said bank. On May 1, 1923, the deposits in the Commercial Savings Bank exceeded the aggregate of the private and corporate surety bonds, but, on June 1st, and from that time forward, the face of the bonds exceeded the deposits. In the meantime, and on October 12, 1923, additional corporate surety bonds, aggregating $180,000, were approved by the executive council. The large deposits in the Commercial Savings Bank, which at one time exceeded a million dollars, were due to the influx of money from the sale of bonds to pay the soldiers' bonus.

Two principal defenses which it is necessary to consider in

this opinion were interposed by the appellant Waterbury, namely, that the $500,000 bond was executed solely for the purpose of securing deposits of funds which were a part of the soldiers' bonus, and that, prior to and at the time of the execution thereof, it was orally agreed between the sureties thereon and W. J. Burbank, treasurer of state, that, as soon as the deposits in the bank fell below the aggregate amount of the paid corporate bonds, the private bond would automatically terminate, and that the treasurer of state released the collateral above referred to for $115,000, and that the appellant sureties are, on account thereof, released from liability to that extent. The separate defenses set up by the remaining appellants will be referred to later.

Before proceeding to the discussion of the foregoing propositions urged by the appellants, we shall, for convenience, set out in full the statutes applicable to the facts of this case. They are as follows:

"The treasurer of state, with the advice and approval of the executive council, may designate one or more banks in the city of Des Moines as a depositary for the collection of any drafts, checks and certificates of deposit that may be received by him on account of any claim due the state." Section 111, Code of 1897.

"The bank or banks designated as such depositary shall be required to give security to the state, to be approved by the executive council, for the prompt collection of all drafts, checks, certificates of deposit or coupons that may be delivered to such depositary by the treasurer of state for collection; and also for the safe-keeping and prompt payment, on the treasurer's order, of the proceeds of all such collections; also, for the payment of all drafts that may be issued to said treasurer by such depositary." Section 112, Code of 1897.

"Whenever security is required to be given by law or by order or judgment of a court, and no particular mode is prescribed, it shall be by bond." Section 355, Code of 1897.

"The treasurer of state, on the receipt of any draft, check or certificate of deposit on account of state dues, may place the same in such depositary for collection, and it shall be the duty of such depositary to collect the same without delay, and charge no greater per cent for such collection than the minimum per

cent charged to other parties, and notify the treasurer when collected. On the receipt of such notice, the treasurer shall issue his receipt to the party entitled thereto, as now required by law. On the moneys remaining on deposit, such depositary shall pay to the treasurer of state, for the use of the state, interest at such rate, and at such times, as shall be agreed upon between said treasurer and the depositary aforesaid, with the approval of the executive council." Section 113, Code Supplement, 1913.

The bond executed by appellants in form and substance fully complied with the foregoing statutory requirements. The material part of said bond is as follows:

"Now, therefore, if the above bounden Commercial Savings Bank shall promptly collect all drafts, checks, certificates of deposit, coupons or other evidence of indebtedness, that may be delivered to such bank by the said treasurer of state for collection, and shall promptly account for and pay, on the treasurer's order, the sums of money which may come into its hands as such depositary, with interest thereon as provided by statute, and safely keep for the use of the state the proceeds of all collections, and shall also pay or cause to be paid all drafts that may be issued to said treasurer by such depositary, and faithfully perform all things required of a depositary under the laws of the state of Iowa, and save and keep harmless the said state of Iowa from all losses by or on account of any moneys coming into his hands as such depositary, then this obligation to be void, otherwise to be and remain in full force and effect."

The evidence of the alleged oral agreement is brief, and, except as to the knowledge of the members of the executive council, other than Burbank, of the alleged oral understanding, without substantial conflict. Appellant John A. Elliott testified that Burbank told him that he was having difficulty to secure depositaries for the soldiers' bonus, soon to be paid, and requested that the Commercial Savings Bank accept a portion thereof, and agreed to a private bond as security therefor; that it was orally agreed between them that, when the deposits in the bank fell below the aggregate amount of paid surety bonds, the private bond would automatically terminate; that he communicated this understanding to the remaining officers and directors of the bank; and that they signed the bond in reliance upon said oral agreement. Burbank corroborated Elliott's testi-

mony as to the agreement, and further testified that he reported the same to the executive council. All of the other members of the executive council testified that they had no recollection of such a report, and that, if they had known of the alleged agreement, they would have declined to approve the bond. The testimony on behalf of appellants finds corroboration in the fact that they were all officers and members of the board of directors of the bank, and would naturally not desire to assume an obligation on which they would, in case of default, be liable for contribution to the bonding companies to whom premiums had been paid. On the other hand, the surety bonds prior to June 5, 1923, amounted to only $145,000, while the deposits on January 2d were $367,000, and continually increased until June 1st, when they exceeded $633,000.

A memorandum kept in the treasurer's office contained an entry opposite the $500,000 bond executed in 1922, "In process of renewal."

A number of the appellants also testified to conversations with Elliott in which he explained to them the oral agreement with Burbank. As already stated, the state has been fully paid, and has no interest in the controversy between the sureties.

The appellant Waterbury also asked for the reformation of the bond, to conform it to the alleged oral agreement of the parties. Manifestly, evidence of an oral agreement would not be admissible on behalf of appellants in an action against them to recover on the bond, under the familiar parol-evidence rule. But it is insisted by all appellants that parol evidence of such agreement was admissible as against the bonding companies, which are seeking contribution. This may, for all the purposes of this appeal, be assumed, but see *Livingston v. Stevens*, 122 Iowa 62; *Logan v. Miller*, 106 Iowa 511; *In re Assessment of Shields Bros.*, 134 Iowa 559; *DeGoey v. Van Wyk*, 97 Iowa 491; *Peters v. Goodrich*, 192 Iowa 790.

The far more difficult question is: May the appellants set up the alleged oral agreement as against the corporate sureties who have paid the obligation of their principal, to defeat contribution? The right of one surety, under such circumstances, to recover contribution of cosureties, although they have signed different instruments, is universally recognized. Pingrey on Suretyship & Guaranty (2d Ed.), Section 203; Spencer on

982

Suretyship, Section 150 *et seq.*; 1 Brandt on Suretyship & Guaranty (3d Ed.), Sections 281–285; *Bankers Sur. Co. v. Wyman*, 141 Iowa 574; *Hoyt v. Griggs*, 164 Iowa 672. Manifestly, if the alleged oral agreement was valid for any purpose, and is available to appellants at all, it is because, as to the balance on deposit in the bank when it closed, they and the paid sureties were not cosureties.

The bond for the performance of which appellants were sureties is a statutory bond. The treasurer of state may, under the statute, designate one or more banks in the city of Des Moines as a depositary for the collection of drafts, checks, and certificates of deposit only with the advice and approval of the executive council. The bond executed by the depositary so designated must be approved by the executive council, and not by the treasurer alone. The bond in question was so approved. It thereafter was a binding obligation to the state, according to the terms and provisions of the statute, which was a part thereof, and, as already stated, could not be varied or contradicted by parol. The terms and provisions of the statute are read into the bond, and a construction of the statute is a construction of the bond. *Schisel v. Marvill*, 198 Iowa 725; *Farmers' State Bank v. Brazoria County* (Tex. Civ. App.), 275 S. W. 1103; *State ex rel. Board of Com. v. Sutton*, 120 N. C. 298 (26 S. E. 920). Neither the treasurer nor the executive council is clothed with power to vary or modify the provisions of the statute, and if the bond is incomplete, what of the statute is lacking will be read into it; and if it contains provisions not required thereby, such provisions will, if separable, be treated as surplusage. *Schisel v. Marvill*, supra; *Philip Carey Co. v. Maryland Cas. Co.*, 201 Iowa 1063; *United States F. & G. Co. v. Iowa Tel. Co.*, 174 Iowa 476; *Nebraska Culv. & Mfg. Co. v. Freeman*, 197 Iowa 720. See, also, *Leach v. Commercial Sav. Bank*, 205 Iowa 1154.

A statutory bond, complete on its face, will not be reformed at the suit of a surety, to make it conform to some understanding that will defeat its purpose. Appellants intended to execute a statutory bond, and were bound to know that, when executed, it became binding upon them until terminated by law, and in the manner provided. The purpose and character of the bond required of a depositary of public funds having been prescribed by the

legislature, its requirements must be complied with. The authority of the executive council in such matter is limited by the statute to the approval of the bond, after the depositary has been designated by the treasurer, by and with the advice of such council. The alleged oral agreement was wholly invalid, as against the state.

In the light of the foregoing, was the relationship of the signers of the respective bonds that of cosureties? The bonds were executed to secure the same obligation, unless the alleged oral agreement that the private bond was to automatically terminate when the deposits in the bank fell below $275,000 is valid as between the sureties. Something more than the admissibility of parol evidence to prove the agreement is involved. If the agreement itself was invalid as between the parties thereto, was it not invalid as to everyone else? The doctrine of contribution between cosureties is of equitable origin, and rests upon the maxim that equality is equity. If inequality exists, it is in the fact that the bank, of which appellants were officers and sureties, paid premiums for the bonds of the corporate surety companies, and then signed a private bond for the accommodation of the bank. The bank, a corporation, is an independent entity, wholly separate and distinct from its officers. The obligation assumed by them as sureties on the bond was wholly personal, and for the accommodation of the bank as principal. The inequality, if any, is more apparent than real. The bond was executed in good faith, and to secure public funds deposited in the bank by the treasurer of state, and for the first five months represented more than four fifths of the obligation of all the bonds held by the state, and, except for the months of July, August, and September, 1923, more than one half of such obligation up to the date the bank closed. There is nothing to indicate that the parties contemplated a very speedy reduction of the deposits to a point below the aggregate amount of the corporate surety bonds, and this was not accomplished until a few days before the bank finally closed. About November 29, 1924, $115,000 of collateral held by the National City Bank of Chicago was released, by order of the treasurer. At this time the deposits of the treasurer amounted to approximately $400,000, and corporate surety bonds to $275,000. During the month of December of that year, the deposits declined until, when the

bank closed, they were less than the corporate surety bonds. The reason for this sharp decrease in the deposits at this time is not shown. But, even if the appellants' claim of an oral contract be conceded, the liability of appellants to the state and for contribution is in no sense affected thereby, for the reason that the contract was wholly void.

II. The appellant Waterbury, on March 4, 1924, resigned from the board of directors, and as vice president of the Commercial Savings Bank. He was at no time very active in the  management of the bank's affairs, although he occasionally attended meetings of the board of directors. He contends that the release of the collateral held by the Chicago bank, at the request of the treasurer of state, operated to release him from liability on the bond to the extent of $115,000, the amount thereof. This contention is based upon the familiar rule well stated by 1 Brandt on Suretyship & Guaranty (3d Ed.), Section 480, as follows:

"If the creditor has a surety for the debt, and also has a lien on property of the principal for the security of the same debt, and he relinquishes such lien, or by his act such lien is rendered unavailable for the payment of the debt, the surety is, to the extent of the value of the lien thus lost, discharged from liability."

The testimony shows that the collateral was put up in pursuance of an oral agreement to that effect. We have sufficiently pointed out that a bank, to legally become a depositary of public funds, must comply with the statutes applicable thereto and quoted in full in this opinion. Neither the treasurer nor the executive council was clothed with authority to accept or approve collateral security for public funds deposited in any bank in the city of Des Moines. They were required to demand bonds, and this is the only form of security which the legislature has authorized. Whether, if the collateral were in the custody of the state as security for deposits, the bank furnishing same would be estopped to demand a return thereof after loss, is not involved, and on this point we express no opinion. We are clear, however, that the collateral was accepted contrary to the plain provisions of the statute, and, this being true, it would seem equally clear that appellant was not discharged of any part of

his liability by the release thereof. It was returned to the bank, of which the sureties, except Waterbury, were, at the time, members of the board of directors, or occupying the position of the executive managers thereof. Its return was to and manifestly accepted by them. Furthermore, the very arrangement between the depositary and the state contemplated both deposit and the withdrawal of deposits. The relationship was not like that of creditor and debtor, existing between the parties to an absolute and unconditional obligation. The deposits in the bank fluctuated, and no doubt the collateral was put up to meet a temporary emergency, resulting from the sale of bonds in connection with the soldiers' bonus. The rule relied upon is not, in our opinion, applicable to the facts of this case. The deposit of the collateral in the Chicago bank, to be held by it as trustee for the security of state funds deposited in the bank, was wholly outside the provisions of the statute, and in no sense constituted the depositary bond required thereby.

III. The point is made by appellants other than Waterbury that they were accommodation sureties, and under no obligation to make contribution to paid sureties. This question does  not appear to have been previously passed upon by this court, and a careful investigation has disclosed but few decisions in other jurisdictions. The authorities, so far as we have been able to ascertain, are unanimous in the holding announced in *United States F. & G. Co. v. Naylor*, 237 Fed. 314, as follows:

"Hence, where some of the cosureties for a common debt have been compensated, but not indemnified, for their suretyship, and others became cosureties for the accommodation of their principals, that fact is immaterial, and the compensated cosureties, who have paid more than their proportion of the common liability, are entitled to contribution from the accommodation cosureties."

See, also, *United States Fid. & Guar. Co. v. McGinnis' Admr.*, 147 Ky. 781 (145 S. W. 1112); *Lewis' Admr. v. United States Fid. & Guar. Co.*, 144 Ky. 425 (138 S. W. 305); *Fidelity & Dep. Co. v. Phillips*, 235 Pa. St. 469 (84 Atl. 432). We agree with the conclusion reached in the foregoing cases.

IV. A. L. Hager, one of the sureties on the bond in ques-

tion, died January 22, 1923, about seven days after the bond was executed. The appellants E. G. Linn and Johnson Brigham testified that they relied upon the judgment and advice of Mr. Hager in becoming sureties on the bond, and that without such reliance and advice they would not have signed the same. It is now contended that Hager, because of the nature of his illness, was mentally incompetent, at the time he signed the instrument, to transact business. Mr. Hager was afflicted with prostatic trouble, which resulted in uremia. Dr. Fleishman testified that, at the time he saw him in the hospital, shortly before his death, Mr. Hager could not have conducted ordinary business intelligently, and that his condition was progressive, and did not come on suddenly. Dr. Grimes testified to the same effect, when first called, but later went further into detail, and explained that he meant that the patient's mental faculties had slowed up; that he was not insane; that he could transact ordinary routine business. This witness said:

"Mr. Hager's only trouble was uremic poisoning, and his mind was not affected otherwise. When I say Mr. Hager was not of sound mind, I mean he was not up to his normal standard, and I cannot say how much understanding he had of his actions, whatever he did. He certainly could not fully appreciate things he did; because no man with a proven toxin, proven blood poisoning of that sort, can take in the full scope of those things. He was simply slowed up."

R. L. Parrish and W. C. Strock, who knew him well, and officed with him, testified that, up to the time he was taken to the hospital, he was not, in their opinion, of unsound mind. The testimony of other witnesses was of similar import. On January 8th preceding his death, he attended a meeting of the board of directors of the bank, and participated actively in the meeting. Many motions were made, and others seconded, by him. Mr. Hager is shown to have been a man of large experience in business affairs, and we are not persuaded by the testimony that he was incompetent to comprehend and understand the purport and extent of his act when he signed the bond.

This conclusion disposes of the contention of all of the sureties. Other questions discussed by counsel are without material bearing on the vital issues in this case. Further discus-

sion is unnecessary. The judgment of the court is affirmed.— *Affirmed.*

All the justices concur.